**Not for Publication**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| OMAR A. ESPINAL, FREDY O. CARBAJAL, ARLEN Y. MARTINEZ, OSCAR RENE CALDERON ROMERO, and WELLINGTON TORRES, *on behalf of themselves and all other similarly situated persons*,<br><br>    *Plaintiffs*,<br><br>  v.<br><br>BOB'S DISCOUNT FURNITURE, LLC, XPO LAST MILE, INC., ABS CORPS., AND JANE & JOHN DOES,<br><br>    *Defendants*. | Civil Action No. 17-2854 (JMV) (JBC)<br><br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

  This putative class action arises from allegations that Defendants failed to pay Plaintiffs overtime.  Plaintiffs Omar A. Espinal, Fredy O. Carbajal, Arlen Y. Martinez, Oscar Rene Calderon Romero, and Wellington Torres, on behalf of themselves and all others similarly situated, assert claims against Defendants Bob's Discount Furniture ("Bob's"), XPO Last Mile, Inc. ("XPO"), ABC Corps., and Jane and John Does for violations of the New Jersey Wage and Hour Law (NJWHL), N.J. Stat. Ann. § 34:11-56a, *et seq.*; the New Jersey Wage Payment Law (NJWPL), N.J. Stat. Ann. § 34:11-4.1, *et seq.*; and the doctrine of unjust enrichment.  D.E. 74.

  Presently before this Court is Plaintiffs' motion for class certification on their NJWHL claim.  D.E. 87-1.  Plaintiffs seek certification of the following class:

> All individuals that were based out of Defendants' Edison and
> Carteret, New Jersey, warehouses that performed truck driving
> and/or helper functions for the Defendants from April 26, 2015

> through to January 2017 out of the Edison Facility and from May 1,
> 2017 through to the present out of the Carteret Facility, who did not
> have direct contracts with either Defendant.

*Id.*  Plaintiffs also seek to be named class representatives and to have their legal counsel appointed

as class counsel pursuant to Rule 23(g).  *Id.*

The motion was decided without oral argument pursuant to Federal Rule of Civil Procedure

78(b) and Local Civil Rule 78.1(b).  The Court has considered the parties' submissions[1] and, for

the reasons stated below, denies Plaintiffs' motion without prejudice.  D.E. 87.  In addition, the

Court has concerns over its subject-matter jurisdiction.  As a result, the Court is also ordering

Plaintiffs to demonstrate that the Court has jurisdiction over this matter.

## I.  BACKGROUND[2]

Defendant Bob's is a limited liability company that sells furniture.  SAC ¶¶ 9-10.

Defendant XPO is a freight forwarder that provides logistics services for companies, including

Bob's.  *Id.* ¶ 12; XPO Ans. ¶ 12.  Plaintiffs are five individuals who allegedly worked for

Defendants in Edison, New Jersey for varying periods of time between May 2012 and June 2018

as drivers and helpers.  SAC ¶¶ 4-8, 19.

The parties contest the nature of their relationship – specifically, they disagree as to

whether Bob's and XPO were employers of Plaintiffs and the putative class members.  According

to Plaintiffs, Bob's and XPO were their employers, as defined by the NJWHL.  SAC ¶¶ 16-17.

Defendants contend that they were not Plaintiffs' employers.  According to XPO, it had a contract

---

[1] Plaintiffs' brief in support of their motion is referred to as "Pl. Br.," D.E. 87-2; and Defendants' joint brief in opposition is referred to as "Def. Opp'n," D.E. 90.

[2] The facts are derived from Plaintiffs' Second Amended Complaint ("SAC"), D.E. 74; Defendant XPO's Answer to the SAC ("XPO Ans."), D.E. 75; and Defendant Bob's Answer to the SAC ("Bob's Ans."), D.E. 76.

to forward freight for Bob's and tendered this freight to independent motor carriers (the "Carriers") to deliver to Bob's customers. XPO Ans. ¶ 23. The Carriers "employed or otherwise contracted" drivers and helpers, but XPO never did. XPO Ans. ¶ 18. Similarly, Bob's denies that it employed Plaintiffs. Bob's Ans. ¶¶ 4-8

Plaintiffs allege that Bob's and XPO used a distribution facility in Edison, New Jersey, which moved to Carteret, New Jersey in or around January 2017. SAC ¶ 13. The Edison and Carteret facilities are referred to collectively as the "New Jersey Facilities." *Id.* At the New Jersey Facilities, XPO provided management and logistic services to Bob's. *Id.* Drivers delivered goods from the New Jersey Facilities to Bob's customers, and helpers traveled with drivers to assist with deliveries. *Id.* ¶ 15.

Plaintiffs allege that Bob's entered into business relationships with XPO, John and Jane Does, and ABC Corps. "to conceal the fact that it had an employer-employee relationship with the Plaintiffs," as evidenced by the control it exerted over "the manner and means in which the Plaintiffs and all Class Members performed their duties." *Id.* ¶ 20-21. Plaintiffs also allege that XPO employed them, as similarly evidenced by XPO's control over their work. *Id.* ¶ 22. Specifically, the SAC alleges that Plaintiffs "reported to work at the Defendants' New Jersey Facilities for Bob's and/or XPO [], took instruction from Bob's and XPO [] employees, communicated with Bob's and XPO [] employees while delivering their routes during the workday and handled paperwork related to or pertaining to Bob's and/or XPO," and that both Bob's and XPO had the authority to reprimand and terminate Plaintiffs. *Id.* ¶¶ 21-22.

Plaintiffs assert that they are not independent contractors and are not exempt under NJWHL. *Id.* ¶¶ 26-27. Plaintiffs further allege that they "routinely worked far in excess of forty (40) hours per week for Defendants and were not paid 1.5 times their hourly rate or 1.5 times the

minimum wage rate" for the excess hours.  *Id.* ¶ 28.  As a result, Plaintiffs argue, they were denied required compensation and/or overtime pay, and the wages they were paid included "various deductions, charges and/or expenses" that did not benefit them, such as "the cost of liability and workers' compensation insurance [and] various performance-based penalties and lease payments." *Id.* ¶ 30.

Defendants deny most of Plaintiffs' allegations.  Bob's and XPO admit that XPO forwarded freight for Bob's, but both deny they jointly operated or utilized a distribution facility. XPO Ans. ¶¶ 12-13; Bob's Ans. ¶ 12.  However, XPO admits it "had employees who were physically present at the Edison and Carteret Facilities, XPO Ans. ¶ 20, and Bob's admits that its furniture is delivered out of distribution facilities in Edison and Carteret, Bob's Ans. ¶ 13.  XPO indicates that it tendered freight to the Carriers at the New Jersey Facilities for delivery to Bob's retail customers and that the Carriers employed or contracted with drivers and helpers.  XPO Ans. ¶¶ 15, 21, 23.  XPO denies that it employed drivers or helpers.  *Id.* ¶ 18.

On April 26, 2017, Plaintiff Espinal filed a class action complaint on behalf of himself and all other similarly situated individuals alleging three counts: (I) violations of the NJWPL; (II) violations of the NJWHL; and (III) unjust enrichment.  D.E. 1.  Defendants XPO and Bob's filed motions to compel arbitration and stay the litigation on July 10 and 17, 2017, respectively.  D.E. 17, 20.  On May 18, 2018, the Court issued an Opinion and Order denying the motions to compel arbitration.  D.E. 37, 38.  Defendant XPO filed an Answer on June 15, 2018.  D.E. 43.  Bob's also filed an Answer on that date, which pled twenty-nine affirmative defenses and asserted cross claims.  D.E. 44.  Bob's later dismissed its cross claims.  D.E. 48.

On December 10, 2018, Plaintiff filed a First Amended Complaint that added five named Plaintiffs.  D.E. 64.  XPO and Bob's filed Answers on December 21, 2018.  D.E. 65, 66.  Plaintiff

filed a Second Amended Complaint on June 3, 2019 to adjust the class definition.  D.E. 74. Defendants XPO and Bob's filed their Answers on June 17, 2019.  D.E. 75, 76.  The parties then commenced class-related discovery, which closed on January 31, 2020.  D.E. 50, 83.  On February 24, 2020, Plaintiff filed the present motion seeking to certify a class of delivery drivers and helpers. D.E. 87.  Defendants jointly filed a brief in opposition.  D.E. 90.

## II.   LEGAL STANDARDS

### A.  New Jersey Wage and Hour Law

Plaintiffs seek class certification only on their NJWHL claim.  The NJWHL "establishes not only a minimum wage but also an overtime rate for each hour of work in excess of forty hours in any week for certain employees.  It does not prescribe the minimum wage or overtime rate payable to independent contractors."  *Hargrove v. Sleepy's LLC*, 106 A.3d 449, 458 (N.J. 2015) (internal citation omitted).  Under the NJWHL, an "employee" is defined as "any individual employed by an employer."  N.J.S.A. § 34:11-56a1(h).  The law defines an "employer" as "any individual, partnership, association, corporation, and the State and any county, municipality, or school district in the State, or any agency, authority, department, bureau, or instrumentality thereof, or any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee."  *Id.* § 34:11-56a1(g).

### B.  Federal Rule of Civil Procedure 23

Federal Rule of Civil Procedure 23 governs class actions.  *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012).  "[E]very putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)."  *Id.* at 590 (citing Fed. R. Civ. P. 23(a)-(b)).  Plaintiffs first bear the burden of showing that the proposed class satisfies the four requirements of Rule 23(a):

>    (1) the class is so numerous that joinder of all members is impracticable;
>    (2) There are questions of law or fact common to the class;
>    (3) The claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>    (4) The representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). These four prongs are often referred to as numerosity, commonality, typicality, and adequacy. *See e.g., Erie Ins. Exch. v. Erie Indem. Co.*, 722 F.3d 154, 165 (3d Cir. 2013).

Plaintiffs also must show that proposed class satisfies Rule 23(b)(1), (b)(2), or (b)(3). *Marcus*, 687 F.3d at 590. Here, Plaintiffs argue that their putative class meets the requirements of Rule 23(b)(3). Under Rule 23(b)(3) plaintiffs must show the following:

> [Q]uestions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Pursuant to Rule 23(c)(1)(A), a court "must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A). The decision to certify a class or classes is left to the discretion of the court. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008), *as amended* (Jan. 16, 2009). "[T]he requirements set out in Rule 23 are not mere pleading rules." *Marcus*, 687 F.3d at 591 (alteration in original) (quoting *Hydrogen Peroxide*, 552 F.3d at 316). "The party seeking certification bears the burden of establishing each element of Rule 23

by a preponderance of the evidence." *Id.*  "A party's assurance to the court that it intends or plans to meet the requirements is insufficient." *Hydrogen Peroxide*, 552 F.3d at 318.

The Third Circuit emphasizes that "'[a]ctual, not presumed[,] conformance' with Rule 23 requirements is essential." *Marcus*, 687 F.3d at 591 (alterations in original) (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 167 (3d Cir. 2001)).  "To determine whether there is actual conformance with Rule 23, a district court must conduct a 'rigorous analysis' of the evidence and arguments put forth." *Id.* (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).  This "rigorous analysis" requires a district court to "resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits – including disputes touching on elements of the cause of action." *Id.* (quoting *Hydrogen Peroxide*, 552 F.3d at 316, 307).  Therefore, a district court "may 'delve beyond the pleadings to determine whether the requirements for class certification are satisfied.'" *Hydrogen Peroxide*, 552 F.3d at 320 (quoting *Newton*, 259 F.3d at 167).

## III.  ANALYSIS

### A.  Rule 23(a) Requirements

#### 1.  Numerosity

"No single magic number exists" to meet the numerosity requirement. *Summerfield v. Equifax Info. Servs. LLC*, 264 F.R.D. 133, 139 (D.N.J. 2009) (quotation omitted).  Yet, "the Third Circuit has previously held that the numerosity requirement will generally be satisfied 'if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40.'" *Id.* (quoting *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001)).

Plaintiffs contend that the number of putative class members "easily exceeds" the Third Circuit's requirement of forty to satisfy numerosity.  Pl. Br. 31.  Plaintiffs assert that during busy

times, approximately forty to forty-five trucks were sent out per day, each with a driver and a helper. Pl. Br. 31. At other times, the daily number of trucks was about twenty to thirty-five. *Id.* These estimates were supported by deposition testimony of an XPO Supervisor. D.E. 87-20 40:25 to 41:15. Plaintiff Martinez asserts that, during his tenure, he personally witnessed between 150 and 200 drivers and helpers. Pl. Br. 31. Defendants do not contest this element. The Court finds that Plaintiffs have satisfied Rule 23(a)(1)'s numerosity requirement.

### 2. Commonality

"Rule 23(a)(2) requires Plaintiffs to demonstrate that 'there are questions of law or fact common to the class.'" *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 487 (3d Cir. 2018) (quoting Fed. R. Civ. P. 23(a)(2)). However, Rule 23(a)(2)'s "language is easy to misread, since any competently crafted class complaint literally raises common questions." *Id.* at 487 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (internal quotation omitted)). "A complaint's mere recital of questions that happen to be shared by class members" is insufficient; instead, "'[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury.'" *Id.* (alterations in original) (quoting *Dukes*, 564 U.S. at 349-50) (internal quotation omitted). "What matters . . . is not the raising of common 'questions' . . . but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (quoting another source). In other words, Plaintiffs' claims "must depend upon a common contention" whereby "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

Plaintiffs argue that the commonality element is satisfied because there are three common questions that must be resolved:

> (1) whether the drivers and helpers were misclassified and should have been treated as 'employees' by the Defendants for purposes of

> the NJWHL; (2) whether the drivers and helpers routinely worked in excess of forty (40) hours per week for the Defendants; and (3) whether the drivers and helpers were compensated with premium overtime pay for all hours worked in excess of forty (40) hours per week.

Pl. Br. 32.  In opposition, Defendants submit that "Plaintiffs have not and cannot demonstrate that these questions are answerable with the same proof for the putative class."  Def. Opp'n 22. Defendants further contend that, to resolve this dispute, evidence about the "policies and practices of the 47 Carriers that actually employed the putative class members" would be required.  *Id.*

Whether the drivers and helpers were misclassified by Defendants and were in fact employees under the NJWHL is a common question that would generate a common answer among Plaintiffs and the Putative Class Members.  This question is also critical to the validity of the Plaintiffs' NJWHL claim.  However, the parties disagree as to the applicable test.  Relying on *Hargrove v. Sleepy's, LLC*, 106 A.3d 449 (N.J. 2015), Plaintiffs contend that the proper test to use is the ABC Test, which presumes that an individual is an employee (as opposed to an independent contractor), unless the employer proves otherwise.  Pl. Br. 7.  Defendants agree that Plaintiffs are not independent contractors.  Def. Opp'n at 1.  Defendants' position is that the Carriers are the employers of Plaintiffs and that the joint employer test must be used to determine whether Bob's and XPO are joint employers.  *Id.* at 25, 27.

The Court agrees with Defendants and finds that the joint employment test is the correct measure.  In *Hargrove*, the New Jersey Supreme Court held that "the 'ABC' test derived from the New Jersey Unemployment Compensation Act . . . *governs whether a plaintiff is an employee or independent contractor* for purposes of resolving a wage-payment or wage-and-hour claim."  106 A.3d at 453 (emphasis added).  The ABC Test is properly applied to ascertain whether a worker should be considered an employee or an independent contractor.  Here, that issue is not disputed

– Defendants concede that "Plaintiffs and the putative class are not independent contractors."  Def. Opp'n 1.  Instead, the question raised is whether Plaintiffs are employees *of Defendants*.  To resolve that inquiry, the joint employer test announced in *In re Enter. Rent-A-Car Wage & Hour Emp't Practices Litig.* is the proper test to apply.  683 F.3d 462, 469 (3d Cir. 2012) ("*Enterprise*"); *Echavarria v. Williams Sonoma, Inc.*, No. 15-6441, 2016 U.S. Dist. LEXIS 33980, \*9 (D.N.J. Mar. 16, 2016) ("*Hargrove* does not discuss which test a court should use to determine who employed a given plaintiff.).

The joint employer test asks whether the alleged joint employer has "(1) authority to hire and fire employees; (2) authority to promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; (3) day-to-day supervision, including employee discipline; and (4) control of employee records, including payroll, insurance, taxes, and the like."  *Enterprise*, 683 F.3d at 469.  Defendant XPO had virtually identical[3] Delivery Service Agreements ("DSAs" or "Agreements") with the different Carriers for which each Plaintiff worked.  D.E. 87-8; 87-9; 87-10; 87-11; 87-12; 87-13; 87-14.  These Agreements governed the relationship between XPO and the Carriers.  Pursuant to the joint employer test, Defendants are either joint employers of *all* potential class members, or they are not joint employers of any potential class member.  Thus, whatever level of control Defendants exerted, it was uniform among

---

[3] The record only includes the DSAs between XPO and seven of the purported forty-seven Carriers for whom the Putative Class Members worked; however, there is evidence that "these contracts were meant to be standardized."  D.E. 87-17 37:16-24; 35:4-15.  There is also evidence that that drivers and helpers were held to the same expectations and performed the same work regardless of which Carrier they worked for.  D.E. 87-18 at 74:20 to 75:8; D.E. 87-19 at 63:5-9.  The deposition of XPO's Director of Customer Accounts further revealed that XPO's interactions with and treatment of drivers and helpers would have "been consistent across the board at Edison and Carteret."  D.E. 8717 38:6 to 39:9.

Plaintiffs and the putative class members regardless of which particular Carrier a given Plaintiff or class member worked for.  The Court finds that the commonality requirement is satisfied.

### 3.  Typicality

"[T]ypicality demands that 'the claims or defenses of the representative parties are typical of the claims or defenses of the class.'"  *Newton*, 259 F.3d at 185 (quoting Fed. R. Civ. P. 23(a)(3)).  In other words, the lead plaintiff's claims must be "comparably central" to the claims of the absent parties.  *Id.* at 183.  This ensures that "the interests of the class and the class representatives are aligned 'so that the latter will work to benefit the entire class through the pursuit of their own goals.'"  *Id.* at 182-83 (quoting *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 141 (3d Cir. 1998)).

The typicality requirement is "intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees."  *Id.* at 183.  However, all plaintiffs are not required to share identical factual circumstances – the requirement only mandates that a named plaintiff's individual circumstances cannot be "markedly different" from the other class members.  *Id.*  "If the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences."  *Id.* at 183-84.  For example, "a claim framed as a violative practice can support a class action embracing a variety of injuries so long as those injuries can all be linked to the practice."  *Id.* at 184 (citing *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 63 (3d Cir. 1994)).  The Third Circuit has reasoned that the typicality requirement "does not mandate that all putative class members share identical claims, because even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct."  *Id.* (internal quotations and citations omitted).

Plaintiffs argue that the typicality requirement is satisfied because the claims of the Plaintiffs and putative class members "are not only typical, they are identical." Pl. Br. 33. Plaintiffs assert that they and all Putative Class Members "performed the same work that benefitted the Defendants"; were "subject to the same control, direction and oversight by the Defendants"; and "were all paid a daily flat rate with no overtime pay." *Id.* Defendants argue that Plaintiffs' claims are not typical of others in the proposed class because Plaintiffs were each paid directly by the Carrier for which they worked, and each Carrier had its own compensation practice. Def. Opp'n 39.

While there may be some variation in the alleged amount of overtime for which each Plaintiff and putative class member worked, Plaintiffs' claims are not "markedly different" from other putative class members. The legal theory of all claims is the same – Plaintiffs and others were misclassified and denied overtime pay as a result. The Court therefore finds that the typicality requirement is satisfied.

### 4. Adequacy

In reviewing the adequacy element, a court must decide whether the class representative "has the ability and the incentive to represent the claims of the class vigorously, that he or she has obtained adequate counsel, and that there is no conflict between the individual's claims and those asserted on behalf of the class." *Sapir v. Averback*, No. 14-07331, 2015 WL 858283, at *3 (D.N.J. Feb. 26, 2015) (citing *Falcon*, 457 U.S. at 157 n.13). "Adequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975). Adequacy functions as a "catch-all requirement" that "tend[s] to merge with the commonality and typicality criteria of

Rule 23(a)." *Newton*, 259 F.3d at 185 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)).  "Whether a party adequately represents a class depends on all the circumstances of the particular case." *Wetzel*, 508 F.2d at 247.

Plaintiffs assert that they meet the adequacy requirement because they "have all been deposed in this action and have demonstrated far more than a 'minimum degree of knowledge' of the claims."  Pl. Br. 34.  Additionally, they contend that counsel "is a highly qualified wage and hour class action litigator."  *Id.*  Defendants do not contest this element.  The Court finds that the adequacy requirement is satisfied.

For the foregoing reasons, the Court concludes that the Rule 23(a) requirements are met in this matter.  D.E. 87.  The Court now turns its Rule 23(b) analysis.

## B.  Proposed Rule 23(b)(3) Class

Plaintiffs seek to certify their proposed class pursuant to Rule 23(b)(3).  The requirements for Rule 23(b)(3) class certification are that "the questions of law or fact common to class members *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for fairly and efficiently adjudicating the controversy."  *Dukes*, 564 U.S. at 362 (emphases added) (citing Fed. R. Civ. P. 23(b)(3)).  These elements are commonly referred to as the "predominance" and "superiority" requirements.  *Id.*  The Third Circuit has also recognized that "[a] plaintiff seeking certification of a Rule 23(b)(3) class must prove by a preponderance of the evidence that the class is ascertainable."  *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015), *as amended* (Apr. 28, 2015).

### 1.  Predominance

The predominance requirement is "a 'far more demanding' standard than the commonality requirement of Rule 23(a)."  *Gonzalez*, 885 F.3d at 195 (quoting *Amchem Prods.*, 521 U.S. at 624).

13

It "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 185 (3d Cir. 2019) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016)). "Predominance turns on the 'nature of the evidence' and whether 'proof of the essential elements of the cause of action requires individual treatment.'" *Williams v. Jani-King of Phila. Inc.*, 837 F.3d 314, 319 (3d Cir. 2016) (quoting *Hydrogen Peroxide*, 552 F.3d at 311).

"At the class certification stage, the predominance requirement is met only if the district court is convinced that 'the essential elements of the claims brought by a putative class are capable of proof at trial through evidence that is common to the class rather than individual to its members.'" *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 127 (3d Cir. 2018) (quoting *Gonzalez v. Corning*, 885 F.3d 186, 195 (3d Cir. 2018) (internal quotation omitted)). To assess this requirement, district courts "must look first to the elements of the plaintiffs' underlying claims and then, 'through the prism' of Rule 23, undertake a 'rigorous assessment of the available evidence and the method or methods by which [the] plaintiffs propose to use the evidence to prove' those elements." *Id.* at 128 (quoting *Marcus*, 687 F.3d at 600).

Plaintiffs seek class certification on their claim that Defendants violated the NJWHL by misclassifying Plaintiffs and failing to pay them proper overtime for the hours they worked in excess of forty each week. The critical element driving Plaintiffs' underlying claim is the alleged misclassification and whether an employer-employee relationship existed between Defendant and Plaintiffs. As discussed in the commonality analysis, XPO utilized standard contracts with every Carrier, D.E. 87-17 37:16-24; 35:4-15, and regardless of which Carrier any individual driver or helper worked for, each performed the same work and was held to the same expectations vis-à-vis

XPO and Bob's, D.E. 87-18 at 74:20 to 75:8; D.E. 87-19 at 63:5-9.  Additionally, the operation of Defendants' business remained unchanged when the facility moved from Edison to Carteret.  D.E. 87-18 75:21 to 76:12; D.E. 87-20 9:21-25.  In light of this evidence about Defendants' uniform treatment of drivers and helpers at both locations, the Court finds that common evidence could be used to make a finding on this requirement.[4]

To recap, when deciding if an entity is a joint employer, courts consider a variety of factors, including whether the alleged employer has: "(1) authority to hire and fire employees; (2) authority to promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; (3) day-to-day supervision, including employee discipline; and (4) control of employee records, including payroll, insurance, taxes, and the like."  *Enterprise*, 683 F.3d at 469.  With respect to the first factor – the authority to hire and fire employees – the Agreements XPO executed with each Carrier, interrogatories, and declarations found in the record, show that Defendants' authority to hire and fire drivers and helpers was uniform and did not depend upon the Carrier involved.  For example, the Agreements contain a provision entitled "Contract Carrier's Employees," which declares that "Carrier may, without prior notice to XPO . . . employ . . . qualified persons."  *E.g.* D.E. 87-9 ¶ 5.  XPO also stated in its answers to interrogatories that it "does not maintain any policies and practices concerning . . . terminations of delivery drivers," and that these matters are left to the service providers who employ/subcontract with the delivery team.  D.E. 87-4 at 14.  And the Declaration of XPO's Director of Customer Accounts further described XPO's involvement in the Carriers' personnel decisions.  D.E. 90-3 ¶¶

---

[4] As noted, Defendants concede that Plaintiffs were employees of the Carriers.  Defendants also do not point to any information concerning the relationship between Plaintiffs and Carriers that would require a separate, individualized determination for some or all of the putative class members or Plaintiffs.

33-34, 36.  Thus, contrary to Defendants' arguments, there was no difference in XPO's authority to hire and fire drivers and helpers based on which Carrier directly employed them.

Common evidence can also be used to assess the second factor – the authority to promulgate rules and assignments and set conditions of employment.  For example, both Bob's agreement with XPO and XPO's Agreements with the Carriers require that all drivers and helpers undergo background checks.  D.E. 87-6 ¶ 5(D); D.E. 87-9 ¶ 14.  There is also evidence that XPO required Carriers to drug test any drivers or helpers used as to XPO.  *E.g.*, D.E. 87-9 ¶ 14.  Evidence about Defendants' involvement in assigning delivery routes to individual drivers is also included in the record.  D.E. 87-4 at 12; D.E. 87-16 at 12.  Further, the Agreements declare that "Carrier agrees that it retains complete and exclusive direction and control over its employees and all those working for it in any capacity."  *E.g.* D.E. 87-9 ¶ 5.  Thus, whatever authority XPO possessed to promulgate rules and assignments and set employment conditions for drivers and helpers, that authority was uniform among Plaintiffs and the putative class members and can be established with common proofs.

The record also demonstrates that the third factor – day-to-day supervision, including employee discipline – can be resolved through common evidence.  For example, statements from XPO indicate it lacks policies or practices concerning discipline, suspension, or termination of delivery drivers because those matters are left to the Carriers, D.E. 87-4 at 14; Carriers are not treated differently in this regard.  The record also contains information on Defendants' roles in assigning daily delivery routes to drivers and helpers,  D.E. 87-17 53:22 to 54:16, and Defendants' roles in daily morning meetings with drivers and helpers during which the previous day's performance metrics were reviewed, *id.* 56:15 to 56:10.  Further, XPO had the ability to track the drivers and helpers while on their delivery routes.  *Id.* 71:23 to 72:19.  This evidence shows that,

16

regardless of which Carrier was the direct employer of a driver or helper, Defendants exercised the same level of daily supervision.

Finally, common evidence can be used to prove the fourth element – control of employee records.  While there is minimal evidence in the record as to what records Defendants did maintain, the evidence suggests that the Defendants' record-keeping policies were consistent among all drivers and helpers regardless of Carrier.  For example, with respect to compensation records, it appears that Defendants did not kept records for any drivers or helpers – Bob's does not compensate Plaintiffs or other delivery drivers, D.E. 87-16 at 7, and "XPO does not compensate the plaintiff or anyone in the putative class, D.E. 87-4 at 26.  Further, Bob's does not keep track of who contracts with XPO, D.E 87-16 at 5, suggesting it does not possess employment records for any drivers or helpers.  Although the record does not clearly demonstrate which Defendant maintained which records (if any), it does show once again that Defendants treated all drivers and helpers the same with respect to maintenance of records.

Common evidence in the record shows that Defendants had an equal level of control and authority over each individual driver and helper.  Neither Bob's nor XPO ever indicated that the drivers and helpers directly employed by one Carrier were treated differently from those directly employed by another.  Instead, the deposition testimony, interrogatories, and agreements between the parties demonstrate uniform treatment of, and authority over, all drivers and helpers.  The Court makes no findings about the ultimate outcome of the joint employer test and whether Defendants are employers of Plaintiffs and the putative class members; however, the Court concludes that the predominance factor is established because this inquiry can be resolved with common evidence.

Plaintiffs' complaint raises additional issues: that class members routinely worked over forty hours per week and that they were not properly compensated with overtime.  While these

inquiries may require individual proofs, they do not undermine Plaintiffs' satisfaction of the predominance requirement. "The fact that individual class member worked different hours and received a different amount of pay does not preclude a finding that common issues of law and fact predominate over individual ones." *Troncone v. Velahos*, No. 10-2961, 2013 U.S. Dist. LEXIS 41202, *15-16 (D.N.J. Mar. 25, 2013) (citing *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir.1977) ("[I]t has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate.")). The central question in this case – and the one that will determine liability – is whether Plaintiffs and the Putative Class Members are employees of Defendants. The Court therefore concludes that Plaintiffs have satisfied the predominance requirement because common issues of law and fact predominate over individualized inquiries.

### 2. Superiority

"In determining whether a class action is the superior form of handling a case, a court must 'balance, in terms of fairness and efficiency, the merits of a class action against those of "alternative available methods" of adjudication.'" *Troncone*, 2013 U.S. Dist. LEXIS 41202 at *16 (quoting *Georgine v. Amchem Prods.*, 83 F.3d 610, 632 (3d Cir. 1996)). "Among other considerations, class treatment is often superior where individual claims are small or modest." *Id.*

Plaintiffs argue the superiority requirement is met because "[a] single class action is undoubtedly superior to dozens of individual cases on exactly the same issues, which would be inefficient, result in duplicative discovery, lead to inconsistent results, dramatically increased litigation costs, and needlessly burden the Court." Pl. Br. 38-39. Plaintiffs also submit that "many individuals will have relatively small damages." *Id.* at 39. Defendants contend that superiority is not satisfied because "if predominance is lacking, superiority naturally lacks also." Def. Opp'n

38.

The Court agrees with Plaintiffs.  The amounts owed to each Plaintiff and putative class member are relatively small (according to Plaintiffs and not disputed by Defendants), which weighs in favor of class action.  Additionally, pursuant to the enumerated factors in Rule 23(b)(3), "there is no evidence that this forum is an undesirable one for the concentration of this litigation, or that the management of this class action would present any particular difficulties." *Troncone*, 2013 U.S. Dis. LEXIS 41202 at *16.  Further, the question of liability does not need to be litigated more than once in light of the common evidence that can be used to resolve the issue.  The Court finds that Plaintiffs have satisfied the superiority requirement.

### 3.  Ascertainability

 "The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Byrd*, 784 F.3d at 163 (quoting *Hayes v. Wal-mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)).  "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Marcus*, 687 F.3d at 593. "However, a plaintiff need not 'be able to identify all class members at class certification – instead, a plaintiff need only show that class members can be identified.'" *Hargrove v. Sleepy's LLC*, No. 19-2809, 2020 U.S. App. LEXIS 28501, * (3d Cir. May 27, 2020) (quoting *Byrd*, 784 F.3d at 163 (quotation omitted)).

As previously mentioned, Plaintiffs seek to certify the following class:

> All individuals that were based out of Defendants' Edison and Carteret, New Jersey, warehouses that performed truck driving and/or helper functions for the Defendants from April 26, 2015 through to January 2017 out of the Edison Facility and from May 1,

> 2017 through to the present out of the Carteret Facility, who did not
> have direct contracts with either Defendant.

D.E. 87-1.  To prevail on this requirement, Plaintiffs must show by a preponderance of evidence that it is ascertainable to identify the individuals who performed driver or helper services for Defendants during this period of time, out of the Edison and Carteret facilities, who did not have contracts directly with XPO or Bob's.

As discussed below, Plaintiffs identify methods through which they can meet their burden as to ascertainability.  Defendants, however, assert that the actual information – on which Plaintiffs rely – does not exist or does not exist to the extent claimed by Plaintiffs.  Plaintiffs do not overcome Defendants' arguments by pointing to actual evidence in support of their (Plaintiffs') position.  As a result, Plaintiffs have not met their burden at this time.

Plaintiffs assert that Bob's records – particularly its "daily performance-related records of all the delivery drivers and helpers whose names appear on the delivery manifests it creates" – would allow the putative class to be "easily ascertained."  Pl. Br. 39.  Defendants argue that Plaintiffs cannot meet the second requirement because "there is systemic uncertainty about who performed the delivery services and when."  Def. Opp'n 40.  Specifically, Defendants contend that there is "no record off what putative class member provided what delivery services on what days" and that "the driver name listed on the manifests is often not the driver that operates the truck." *Id.*

If Plaintiffs are correct, then Bob's delivery manifests apparently reflect evidence by which the proposed class could be readily ascertained.  Deposition testimony from Plaintiffs explained that each morning upon arriving at the facility, workers were given a manifest that contained delivery routes, the name of the assigned driver and helper, the client's information and a description of the products to be delivered.  D.E. 87-27 at 35:22 to 37:17.  And a Declaration from

20

an XPO employee explains that while delivery teams were out making deliveries, XPO "would routinely be coordinating the next day's deliveries with the Carriers . . . and learning from the Carrier which teams it was assigning to the routes it accepted." D.E. 90-3 ¶ 63. The manifests or delivery records should be able to show which individuals served as drivers and helpers on each date in the class period. But Plaintiffs have not produced any actual manifests.

Customer feedback and related information offers another potential channel through which the class could potentially be ascertained. XPO did not collect customer feedback itself, "but received such information from Bob's" and explained that if a Carrier was failing to meet customer expectations, XPO "would communicate that to the Carrier so it could . . . provide any necessary training to its delivery teams." D.E. 90-3 at ¶¶ 64-65. Deposition testimony provided by Issani Ballard, the former Director of Client Solutions at XPO, indicated that part of her job was "[e]nsuring that all of the drivers and the helpers that were providing service to the company were, in fact, qualified to be there." D.E. 87-18 at 13:6-17. She further described the metrics used to score delivery drivers – teams were evaluated based on customer service, completion of deliveries, and "running on time." *Id.* at 22:5-25. Bob's calculated the metrics and would rank the drivers and helpers. *Id.* at 23:5-25. The data and scores were sent from Bob's to XPO and placed on a board in the facility so that drivers and helpers could see how they were doing. *Id.* at 28:15 to 29:4. The performance metrics were shared daily. *Id.* at 29:13 to 30:1. Additionally, Bob's would make XPO aware of any performance issues with specific drivers or helpers and, if the team's performance did not improve, Bob's could require that the team no longer provide service to its customers. *Id.* at 36:5 to 37:20. This evidence – assuming that it exists – suggests that Bob's was tracking and maintaining information on each driver and helper's daily performance, which could be used to ascertain the class.

Although these facts suggest that the manifests and/or customer feedback data (and related metrics) could be used to prove which drivers and helpers worked on any given day, this data is currently absent from the record.[5]  Plaintiffs may have ways to obtain the necessary data to show that the class can be ascertained in an administratively feasible way.  Under the NJWHL "[a]n employer is required to keep accurate records showing the names of its employees, days and hours worked, and other information."  *Hargrove v. Sleepy's LLC*, No. 19-2809, 2020 U.S. App. LEXIS 28501, *36 (3d Cir. Sept. 9, 2020).  Based on this statutory duty to keep records, Plaintiffs may attempt to subpoena the Carriers for employment records.  Alternatively, if neither Defendants nor the Carriers have such records, Plaintiffs can meet their burdens of proof by 'produc[ing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'" *Id.* (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)).  Such inferences "are often necessary 'to fill an evidentiary gap created by the employer's failure to keep adequate records.'"  *Id.* (quoting *Tyson Foods*, 136 S. Ct. at 1047).

Thus, Plaintiffs have demonstrated methods to satisfy the ascertainability requirement.  But Plaintiffs have not provided any evidence of the actual records or data so that their stated methods can actually be employed.  As a result, Plaintiffs have not yet met their burden as to ascertainability.

## IV.  SUBJECT-MATTER JURISDICTION

Plaintiffs claim that "[j]urisdiction is proper under 28 U.S.C. § 1331 because this action arises under the Class Action Fairness Act ("CAFA").  *See* 28 U.S.C. § 1332(d)."  SAC ¶ 2.  This jurisdictional statement is incorrect as a matter of law.  Section 1331, which pertains to federal question jurisdiction, is *not* raised in the SAC; the SAC asserts no federal claims.  Section 1332

---

[5] The Court notes that class discovery closed on January 31, 2020.  D.E. 83

pertains to diversity jurisdiction and includes CAFA.  CAFA, in turn, has specific requirements, including minimal diversity, number of class members, and the amount in controversy.  28 U.S.C. § 1332(d).  The SAC does not appear to address these requirements.  As a result, Plaintiffs shall demonstrate in writing this Court's subject-matter jurisdiction pursuant to CAFA.  Assuming that Plaintiffs can show jurisdiction under CAFA, Plaintiffs shall also analyze 28 U.S.C. § 1332(d)(4), which requires the Court to decline exercising subject-matter jurisdiction if certain requirements are met.

## V.  CONCLUSION

For the reasons stated above, and for good cause shown, Plaintiffs' motion for class certification (D.E. 87) is **DENIED** without prejudice.  In addition, Plaintiff must demonstrate that the Court has subject-matter jurisdiction.  An appropriate Order accompanies this Opinion.


Dated: October 14, 2020


John Michael Vazquez, U.S.D.J.