**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| OMAR A. ESPINAL, FREDY O. CARBAJAL, ARLEN Y. MARTINEZ, OSCAR RENE CALDERON ROMERO, and WELLINGTON TORRES, *on behalf of themselves and all other similarly situated persons,*<br><br>        *Plaintiffs,*<br><br>    v.<br><br>BOB'S DISCOUNT FURNITURE, LLC, XPO LAST MILE, INC., ABS CORPS., AND JANE & JOHN DOES,<br><br>        *Defendants*. | Civil Action No. 17-2854 (JMV) (JBC)<br><br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

This putative class action arises from allegations that Defendants failed to pay Plaintiffs overtime. Plaintiffs Omar A. Espinal, Fredy O. Carbajal, Arlen Y. Martinez, Oscar Rene Calderon Romero, and Wellington Torres, on behalf of themselves and all others similarly situated, assert claims against Defendants Bob's Discount Furniture ("Bob's") and XPO Last Mile, Inc. ("XPO") for violations of the New Jersey Wage and Hour Law ("NJWHL"), N.J. Stat. Ann. § 34:11-56a, *et seq.*; the New Jersey Wage Payment Law ("NJWPL"), N.J. Stat. Ann. § 34:11-4.1, *et seq.*; and unjust enrichment. D.E. 122.

Presently before this Court is Plaintiffs' motion for class certification on their NJWHL claim. D.E. 132. Plaintiffs seek certification of the following class:

> All individuals that were based out of Defendants' Edison and Carteret, New Jersey, warehouses that performed truck driving and/or helper functions for the Defendants from April 26, 2015

> through to January 2017 out of the Edison Facility and from May 1,
> 2017 through to the present out of the Carteret Facility, who did not
> have direct contracts with either Defendant.

*Id.* at 2.  Plaintiffs also seek to be named class representatives and to have their legal counsel

appointed as class counsel pursuant to Rule 23(g).  *Id.*

The motion was decided without oral argument pursuant to Federal Rule of Civil Procedure

78(b) and Local Civil Rule 78.1(b).  The Court has considered the parties' submissions[1] and, for

the reasons stated below, Plaintiffs' motion is denied.

## I.  BACKGROUND[2]

Defendant Bob's is a limited liability company that sells furniture.  TAC ¶¶ 19-20.

Defendant XPO is a third-party provider of end-to-end goods management and logistics services

for companies such as Bob's.  *Id.* ¶ 22.  Plaintiffs are five individuals who allegedly worked as

drivers and helpers for Defendants for varying periods between May 2012 and June 2018.  *Id.* ¶¶

14-18, 28.

Plaintiffs allege that Bob's and XPO used a distribution facility in Edison, New Jersey,

which moved to Carteret, New Jersey in or around January 2017.  TAC ¶ 23.  The Edison and

Carteret facilities are referred to collectively as the "Facilities."  *Id.*  At the Facilities, XPO

provided management and logistic services to Bob's.  *Id.*  Drivers delivered goods from the

Facilities to Bob's customers, and helpers traveled with drivers to assist with deliveries.  *Id.* ¶ 25.

The parties contest the nature of their relationship – specifically, they disagree as to

---

[1] Plaintiffs' brief in support of their motion is referred to as "Br.," D.E. 132-1; Defendants' joint brief in opposition is referred to as "Opp.," D.E. 133; and Plaintiffs' reply brief in further support of their motion is referred to as "Reply," D.E. 136.

[2] The facts are derived from Plaintiffs' Third Amended Complaint ("TAC"), D.E. 122; Defendant XPO's Answer to the TAC ("XPO Ans."), D.E. 123; and Defendant Bob's Answer to the TAC ("Bob's Ans."), D.E. 124.

whether Bob's and XPO were employers of Plaintiffs and the putative class members.  According to Plaintiffs, Bob's and XPO were their employers, as defined by the NJWHL and NJWPL.  TAC ¶¶ 26-27.  Plaintiffs allege that Bob's entered into business relationships with XPO "to conceal the fact that it had an employer-employee relationship with the Plaintiffs," which was evidenced by the control Bob's exerted over "the manner and means in which the Plaintiffs and all Class Members performed their duties."  *Id.* ¶ 29-30.  Plaintiffs also allege that XPO employed them as evidenced by XPO's control over their work.  *Id.* ¶ 31.  Specifically, Plaintiffs indicate that they "reported to work at the [] Facilities for Bob's and/or XPO [], took instruction from Bob's and XPO [] employees, communicated with Bob's and XPO [] employees while delivering their routes during the workday and handled paperwork related to or pertaining to Bob's and/or XPO," and that both Bob's and XPO had the authority to reprimand and terminate Plaintiffs.  *Id.* ¶¶ 30-31.

Defendants respond that they were not Plaintiffs' employers.  Bob's Ans. ¶ 26; XPO Ans. ¶ 27.  According to Bob's, it contracted with XPO to arrange for delivery services, XPO tendered the freight to motor carriers (the "Carriers"), and the Carriers employed or otherwise contracted with drivers and helpers to perform the deliveries.  Bob's Ans. ¶ 25.  XPO similarly claims that it contracted with the Carriers to perform delivery services for Bob's and that the Carriers employed or otherwise contracted with drivers and helpers to perform these deliveries.  XPO Ans. ¶¶ 23, 25, 32.  Defendants note that Plaintiffs' previous pleadings identified the Carriers with whom XPO contracted—ABC Corps. and Jane and John Does—as Plaintiffs' employers or joint employers. D.E. 1 ¶¶ 15, 21; D.E. 64 ¶¶ 20, 26; D.E. 74 ¶¶ 18, 24.  The Third Amended Complaint does not name ABC Corps. or Jane and John Does as Defendants.  D.E. 122.

Plaintiffs assert that they are not independent contractors and are not exempt under the NJWHL.  *Id.* ¶¶ 33-34.  Plaintiffs further allege that they "routinely worked far in excess of forty

(40) hours per week for Defendants and were not paid 1.5 times their hourly rate or 1.5 times the minimum wage rate" for the excess hours. *Id.* ¶ 35.  As a result, Plaintiffs argue, they were denied legally required compensation and/or overtime pay, and the wages they were paid included "various deductions, charges and/or expenses" that did not benefit them, such as "the cost of liability and workers' compensation insurance [and] various performance-based penalties and lease payments." *Id.* ¶¶ 36-37.  Defendants deny these allegations.  XPO Ans. ¶¶ 33-37; Bob's Ans. ¶¶ 33-37.  Defendants further note that because Plaintiffs' compensation was handled by the Carriers that employed them, Defendants lack sufficient knowledge as to whether Plaintiffs were paid overtime pay and Plaintiffs' payment deductions.  XPO Ans. ¶¶ 35, 37; Bob's Ans. ¶¶ 35, 37.

On April 26, 2017, Plaintiff Espinal filed a class action Complaint, alleging three counts: (1) violations of the NJWPL; (2) violations of the NJWHL; and (3) unjust enrichment.  D.E. 1.  On December 10, 2018, Plaintiff filed a First Amended Complaint that added five named Plaintiffs.  D.E. 64.  XPO and Bob's filed Answers on December 21, 2018.  D.E. 65, 66.  Plaintiffs filed a Second Amended Complaint on June 3, 2019 to adjust the class definition.  D.E. 74.  Defendants XPO and Bob's filed their Answers on June 17, 2019.  D.E. 75, 76.  The parties then commenced class-related discovery, which closed on January 31, 2020.  D.E. 50, 83.

### A.  Plaintiffs' Initial Motion for Class Certification

On February 24, 2020, Plaintiffs filed a motion to certify a class for their NJWHL claim.  Plaintiffs' proposed class definition remains the same in the present motion.  D.E. 87 at 1.  Defendants jointly filed a brief in opposition.  D.E. 90.  In arguing against class certification, Defendants did not take issue with the proposed class definition or its connection to Plaintiffs' overtime claims under the NJWHL.  Defendants did raise an issue with the overtime claims as to commonality and predominance.  Specifically, Defendants argued that whether Plaintiffs routinely

4

worked in excess of 40 hours per week and were compensated for any overtime could not be resolved with common proof, and that individualized inquiries regarding hours worked and overtime compensation defeated the predominance requirement. *Id.* at 34-37.

On October 14, 2020, the Court issued an Opinion and Order denying Plaintiffs' motion for class certification without prejudice. D.E. 100, 101. The Court found that Plaintiffs had adequately established the four requirements of Rule 23(a) – numerosity, commonality, typicality, and adequacy. *Id.* The Court also found that Plaintiffs had satisfied the predominance and superiority requirements of Rule 23(b). *Id.* As to Defendants' arguments regarding Plaintiffs' overtime claims, the Court held that individualized proof as to overtime did not defeat the predominance requirement. *Id.* at 17-18. The Court reasoned that "[t]he central question in this case – and the one that will determine liability – is whether Plaintiffs and the Putative Class Members are employees of Defendants," and that calculation of damages on an individual basis should not preclude certification when common issues determining liability predominate. *Id.* at 18. The Court added that the fact that individual class members worked different hours and received different amounts of pay did not preclude a finding that common issues predominate. *Id.*

The Court went on to find, however, that Plaintiffs had not met the ascertainability requirement because despite "demonstrate[ing] methods to satisfy the ascertainability requirement," Plaintiffs failed to "provide[] any evidence of the actual records or data so that their stated methods can actually be employed." *Id.* at 22. Specifically, the Court noted that delivery manifests and/or customer feedback data could be used "to prove which drivers and helpers worked on any given day," but this data was absent from the record. *Id.* The Court also noted that "Plaintiffs may have ways to obtain the necessary data to show that the class can be ascertained in an administratively feasible way," including potentially subpoenaing the Carriers for records

showing employee names as well as days and hours worked.  *Id.*  The Court found that, in the absence of such records, Plaintiffs could meet their burdens of proof by "produc[ing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* (quoting *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 470 (3d Cir. 2020) (alteration in original)). Because Plaintiffs had not satisfied the ascertainability requirement, the Court denied the motion for class certification without prejudice.

The Court incorporates by reference its October 14, 2020 Opinion and Order, D.E. 100, 101, so that either party may seek appropriate interlocutory review pursuant to Federal Rule of Civil Procedure 23(f) in conjunction with the current decision.[3]

**B.  Plaintiffs' Renewed Motion for Class Certification**

On February 17, 2021, the Court ruled that as to the current motion for class certification, the parties could "only address issues that the Court did not rule upon in its October 14, 2020 Opinion and Order, D.E. 100, 101."  D.E. 128 at 2.  Plaintiffs then filed the present motion proposing the same class definition set forth in their initial motion.  *Compare* D.E. 132 at 2 *with* D.E. 87 at 1.

In support of their present motion, Plaintiffs submit samples of the following documents to demonstrate that the proposed class is ascertainable:

(1)    XPO spreadsheets apparently setting forth the date of delivery, name of the Carrier, individuals assigned to the delivery, truck number, warehouse location, distance of delivery, number of stops, and time it took to make the delivery, D.E. 132-3;

(2)    Tabs from XPO's spreadsheets titled "All Teams" with a list of Carrier names alongside driver and helper names and a list of drivers and helpers with codes alongside their names, D.E. 132-4, D.E. 132-5;

---

[3] Prior to the Court's February 17, 2021 Order, Defendants indicated that failing to brief class certification anew might deprive them of an opportunity to seek interlocutory review of a complete record pursuant to Federal Rule of Civil Procedure 23(f).  D.E. 125 at 8; Opp. at 29.

(3)    Emails sent by XPO employees listing the drivers assigned to routes in the forthcoming days as well as driver performance scores from a specified date range, D.E. 132-6;

(4)    XPO's background check form that required the Carriers' drivers and helpers to provide identifying information including their name, date of birth, social security number, email address, and driver's license number, D.E. 132-12;

(5)    XPO's drug and alcohol testing release form for Carriers, D.E. 132-13; and

(6)    Identification badges issued by XPO to the drivers and helpers, D.E. 132-14.

Plaintiffs also claim, citing to deposition testimony from XPO's current and former employees, that Defendants maintained daily performance metrics for each driver and helper. Br. at 4. However, Plaintiffs fail to produce any actual performance metric records, other than the driver performance scores included in the XPO emails, D.E. 132-6. Plaintiffs argue that in driver misclassification cases, driver records should suffice for an objective determination of who qualifies as a member of the class. Br. at 9.

Defendants jointly filed a brief in opposition. D.E. 133. Defendants argue that Plaintiffs' information "is inadequate to establish an objective, administratively feasible and reliable mechanism for identifying those who could have been jointly employed *and* may be entitled to unpaid overtime wages." Opp. at 1 (emphasis in original). Defendants first take issue with Plaintiffs' class definition, contending that "it lacks any connection to an overtime claim." *Id.* at 2. Defendants continue that because "there is no objective criteria connecting the putative class to the relief sought, the definition itself is flawed [and] the ascertainability requirement is not satisfied." *Id.* at 11. Defendants similarly state that Plaintiffs propose "no mechanism" to identify class members because they fail to explain how the evidence submitted can be used to identify putative class members who are due unpaid overtime. Opp. at 14-17. According to Defendants, identifying the class would entail "hundreds of mini-trials and evidentiary inquiries" in order to

determine the hours each potential class member worked for Defendants during the class period and whether that individual received any overtime pay due. *Id.* at 24-25. Finally, Defendants argue that Plaintiffs proffer "cherry-picked" data spanning only a short portion of the entire class period. *Id.* at 23.

As noted, the Court limited the current briefing to only those issues that the Court did not rule upon in its October 14, 2020 Opinion and Order, D.E. 128 at 2. The parties agree that the Court previously found that Plaintiffs had not met the ascertainability requirement. However, Defendants raise additional arguments regarding the class definition. Opp. at 9-14. Plaintiffs contend that Defendants "inappropriate[ly] insert[]" these arguments into the ascertainability analysis, which is "[t]he sole issue before the Court in this motion." Reply at 4. The Court, however, never defined in its prior Opinion and Order the appropriate class, as it is required to do. *See* Fed. R. Civ. P. 23(c)(1)(B). Moreover, as further discussed below, the class definition is related to the first prong of the ascertainability inquiry. Accordingly, in deciding the current motion, the Court considers Defendants' arguments regarding the class definition.[4]

## II.   LEGAL STANDARDS

### A.  New Jersey Wage and Hour Law

Plaintiffs seek class certification only on their NJWHL claim. The NJWHL "establishes

---

[4] At the same time, the Court declines to consider Defendants' argument that the ascertainability requirement is not met because questions of individualized proof regarding overtime hours and pay predominate. Defendants improperly blend the predominance and ascertainability inquiries. *See Grandalski v. Quest Diagnostics Inc*., 767 F.3d 175, 184 n.5 (3d Cir. 2014) ("Predominance and ascertainability are separate issues."); *see also Hayes*, 725 F.3d at 359 (despite some overlap between ascertainability and predominance, "they remain separate prerequisites to class certification"); *Byrd*, 784 F.3d at 165 ("The ascertainability inquiry is narrow," and should not be "infuse[d]…with other class-certification requirements."). Moreover, to the extent these individualized questions concern the damages due to each putative class member, "the exact damages owed each driver is not an ascertainability issue," and thus not proper for consideration at this juncture. *Hargrove*, 974 F.3d at 481.

not only a minimum wage but also an overtime rate for each hour of work in excess of forty hours in any week for certain employees.  It does not prescribe the minimum wage or overtime rate payable to independent contractors." *Hargrove v. Sleepy's LLC*, 106 A.3d 449, 458 (N.J. 2015) (internal citation omitted).  Under the NJWHL, an "employee" is defined as "any individual employed by an employer."  N.J.S.A. § 34:11-56a1(h).  The law defines an "employer" as "any individual, partnership, association, corporation, and the State and any county, municipality, or school district in the State, or any agency, authority, department, bureau, or instrumentality thereof, or any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee." *Id.* § 34:11-56a1(g).

### B.  Federal Rule of Civil Procedure 23

Federal Rule of Civil Procedure 23 governs class actions.  *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012).  A renewed motion for class certification should be treated "like any other for class certification" under "the usual Rule 23 standard." *Hargrove*, 974 F.3d at 477 (internal quotation omitted).   "[E]very putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)." *Id.* at 590 (citing Fed. R. Civ. P. 23(a)-(b)).  As noted, in its previous Opinion, D.E. 100, the Court ruled on the four requirements of Rule 23(a) as well as predominance and superiority under Rule 23(b).

In addition to the Rule 23(a) and Rule 23(b)(3) analysis, courts must "clearly define[] the parameters of the class and the claims to be given class treatment," and find that the class is "objectively ascertainable." *Marcus*, 687 F.3d at 591.  "A plaintiff seeking certification of a Rule 23(b)(3) class must prove by a preponderance of the evidence that the class is ascertainable." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015), *as amended* (Apr. 28, 2015).

Pursuant to Rule 23(c)(1)(A), a court "must determine by order whether to certify the action

as a class action." Fed. R. Civ. P. 23(c)(1)(A).  The decision to certify a class or classes is left to the discretion of the court.  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008), *as amended* (Jan. 16, 2009).  "[T]he requirements set out in Rule 23 are not mere pleading rules."  *Marcus*, 687 F.3d at 591 (alteration in original) (quoting *Hydrogen Peroxide*, 552 F.3d at 316).  "The party seeking certification bears the burden of establishing each element of Rule 23 by a preponderance of the evidence."  *Id.*  "A party's assurance to the court that it intends or plans to meet the requirements is insufficient."  *Hydrogen Peroxide*, 552 F.3d at 318.

The Third Circuit emphasizes that "'[a]ctual, not presumed[,] conformance' with Rule 23 requirements is essential."  *Marcus*, 687 F.3d at 591 (alterations in original) (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 167 (3d Cir. 2001)).  "To determine whether there is actual conformance with Rule 23, a district court must conduct a 'rigorous analysis' of the evidence and arguments put forth."  *Id.* (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).  This "rigorous analysis" requires a district court to "resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits – including disputes touching on elements of the cause of action."  *Id.* (quoting *Hydrogen Peroxide*, 552 F.3d at 316, 307).  Therefore, a district court "may 'delve beyond the pleadings to determine whether the requirements for class certification are satisfied.'"  *Hydrogen Peroxide*, 552 F.3d at 320 (quoting *Newton*, 259 F.3d at 167).

## III. ANALYSIS

### A. Class Definition

A court order certifying a class action "must define the class and the class claims, issues, or defenses."  Fed. R. Civ. P. 23(c)(1)(B).  As a result, an order "'must include (1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be

certified, and (2) a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis.'" *Marcus*, 687 F.3d at 591 (quoting *Wachtel v. Guardian Life Ins. Co.*, 453 F.3d 179, 187 (3d Cir.2006)).

The Third Circuit's decision in *Marcus* provides guidance as to a proper class definition. There, the plaintiff leased a BMW equipped with four Bridgestone "run-flat tires," or tires that can run while flat, and experienced four flat tires during his lease. 687 F.3d at 588. The plaintiff sued BMW and Bridgestone asserting claims for breach of warranty, breach of contract, and consumer fraud, and sought to certify a class of current and former purchasers and lessees of certain model-year BMWs equipped with Bridgestone run-flat tires sold or leased in New Jersey with tires that had gone flat and been replaced. *Id*. at 590. The Third Circuit found that the lower court's class definition was "not clear and precise" because the certification order did not expressly define the class but instead referenced the docket entry for the amended notice of motion for class certification. *Id.* at 592. The *Marcus* court added that the class definition was "far from clear" because it seemed to include three different groups of putative class members: owners and lessees who bought or leased a new or used BMW from a New Jersey BMW dealership; subsequent owners and lessees who bought or leased a used BMW in New Jersey from anyone, not just a dealership; and subsequent owners and lessees who bought or leased a used BMW anywhere in the country from anyone who initially bought or leased a BMW in New Jersey. *Id.* Thus, the Third Circuit remanded the case for clarification of the class definition. *Id.*

Here, Plaintiffs' proposed class for their NJWHL claim likewise lacks the precision necessary for a proper class definition. Plaintiffs' class definition includes all individuals based out of the Facilities who performed driving and helping functions for Defendants during the class period. The definition does not, however, limit the putative class to only those drivers and helpers

11

who worked over 40 hours per week for Defendants during the class period.  Without such a limitation, the putative class includes drivers and helpers who do not qualify for overtime compensation under the NJWHL, which establishes an overtime rate "for each hour of working time in excess of 40 hours in any week."  N.J.S.A. § 34:11-56a4(b)(1).  While the proposed class definition may be adequate to address the threshold question of whether Defendants were joint employers of the putative class members, *see* D.E. 100 at 14-17, the Court agrees with Defendants that this definition is inadequate to address the subsequent critical inquiry for Plaintiffs' NJWHL claim: whether each putative class member worked over 40 hours per week.

Plaintiffs' overly broad class definition renders the proposed class problematic.  *See Fuentes v. Super Bread II Corp.*, Civ. A. No. 18-6736, 2020 WL 7237942, at \*2 (D.N.J. Dec. 9, 2020) ("In the Rule 23 context, if the class is overly broad and devoid of reasonable specificity, there is significant potential that unfairness will befall the class members bound by the judgment."); *see also City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*, 867 F.3d 434, 442 n.4 (3d Cir. 2017) ("[A] high degree of over-inclusiveness [of the records proposed to identify class members] could prevent certification[.]").  For example, in *City Select*, the plaintiff was a car dealership that received an unsolicited fax advertisement from credit agent Creditsmarts.  867 F.3d at 437.  The plaintiff asserted a claim under the Telephone Consumer Protection Act and sought to certify a class of car dealers included in Creditsmarts's database who were sent one or more of the unsolicited faxes during the relevant period.  *Id*.  The Third Circuit vacated the district court's ruling that the class was not ascertainable, finding that "the Creditsmarts database define[d] a limited set of potential claimants" and "[t]he only factual inquiry required to determine class membership is whether a particular dealership in the database received the BMW fax on one of the dates in question."  *Id.* at 442.

Defining the class as all drivers and helpers who worked for Defendants during the class period, regardless of whether they worked over 40 hours per week, would be the functional equivalent of defining the *City Select* class as all car dealers included in Creditsmarts's database, regardless of whether they were sent an unsolicited fax.  Such a broad definition would sweep in class members with no connection to the class claim for overtime pay violations.

The Court has "inherent authority to redefine a proposed class in order to maintain a class action." *Portillo v. Nat'l Freight, Inc*., 336 F.R.D. 85, 92 (D.N.J. 2020) (citing Fed. R. Civ. P. 23(c)(1) and *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 185 (1974)).  Accordingly, the Court will modify the class definition to limit the putative class to individuals who worked more than 40 hours per week during the class period:

> All individuals that were based out of Defendants' Edison and Carteret, New Jersey warehouses that performed truck driving and/or helper functions for the Defendants from April 26, 2015 through to January 2017 out of the Edison Facility and from May 1, 2017 through to the present out of the Carteret Facility, who did not have direct contracts with either Defendant*,* and who worked more than forty hours per week performing deliveries for Defendants.

### B.  Ascertainability

"The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Byrd*, 784 F.3d at 163 (quoting *Hayes v. Wal-mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)).  "The ascertainability requirement consists of nothing more than these two inquiries." *Id.*  A plaintiff need not be able to identify all class members at class certification; rather, "a plaintiff need only show that class members *can* be identified." *Id.* (emphasis in original) (internal quotation omitted).  Moreover, "Plaintiff need not, at the class certification stage,

demonstrate that a single record, or set of records, *conclusively establishes class membership*." *City Select*, 867 F.3d at 441 (emphasis added) (citing *Byrd*, 784 F.3d at 163). If, however, "class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Marcus*, 687 F.3d at 593. "As with all of the Rule 23 requirements, a court must rigorously analyze the proposed class to determine how the class is to be ascertained." *Afzal v. BMW of N. Am., LLC*, No. CV 15-8009, 2020 WL 2786926, at *8 (D.N.J. May 29, 2020) (quoting *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013)).

Ascertainability fulfills three objectives. First, ascertainability "eliminates serious administrative burdens that are incongruous with the efficiencies expected in a class action by insisting on the easy identification of class members." *Marcus*, 687 F.3d at 593 (internal quotation omitted). Second, "it protects absent class members by facilitating the 'best notice practicable'" in a Rule 23(b)(3) action. *Id.* (internal citation omitted). Finally, "it protects defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable." *Id.* (internal citation omitted).

### 1. The Objective Criteria Requirement

In *Byrd*, the Third Circuit clarified that class definition and ascertainability are separate inquiries. *See Byrd*, 784 F.3d at 168. Mindful of the Third Circuit's admonition, the Court nevertheless notes that the first prong of ascertainability—that the class must be defined with reference to objective criteria—cannot be completely divorced from the class definition inquiry. As Judge Rendell explained in her concurrence in *Byrd*, the first prong of the ascertainability requirement "is a test that scrutinizes the class definition." *Id.* at 172 (Rendell, J., concurring). Similarly, in *City Select*, the Third Circuit noted that "[u]nder the objective criteria requirement [of ascertainability], a class definition that depends on subjective criteria, such as class members'

state of mind, will fail for lack of definiteness."  867 F.3d at 439 n.3 (first and second alterations

added) (internal quotation and alteration omitted).[5]  Indeed, prior to the Third Circuit's ruling in

*Marcus* that ascertainability should include a second prong, the ascertainability inquiry overlapped

significantly with the inquiry of whether class definition was proper.  *See, e.g.*, *Chiang v. Veneman*,

385 F.3d 256, 271-72 (3d Cir. 2004) (modifying the class definition to eliminate a subjective

criterion which "undermine[d] the validity of the class" because class membership must be

ascertainable by reference to objective criteria); *Rowe v. E.I. Dupont De Nemours & Co.*, 262

F.R.D. 451, 455 (D.N.J. 2009) (assessing whether the proposed class definitions were "readily

ascertainable based on objective criteria" and finding that "[the] definition satisfies the standard

of a practicable class definition").

The class definition, as modified by the Court, is defined with reference to objective

criteria.  Thus, the first prong of ascertainability is met.

## 2.  The Reliable and Administratively Feasible Mechanism Requirement

As the above-cited cases demonstrate, it is the second prong of the ascertainability inquiry

that stands separate and apart from the class definition inquiry.  Indeed, many ascertainability

analyses focus on whether there is a reliable and administratively feasible mechanism for

determining whether putative class members fall within the class definition.  *See, e.g.*, *Afzal v.

BMW of N. Am., LLC*, No. CV 15-8009, 2020 WL 2786926, at *8 (D.N.J. May 29, 2020); *In re

Tropicana Orange Juice Mktg. & Sales Pracs. Litig.*, No. CV 2:11-07382, 2018 WL 497071, at

*9 (D.N.J. Jan. 22, 2018); *In re Thalomid & Revlimid Antitrust Litig.*, No. CV 14-6997, 2018 WL

6573118, at *20 (D.N.J. Oct. 30, 2018).

---

[5] In line with this observation, Judge Fuentes remarked in his concurrence in *City Select* that "a
court can plainly read the class definition and make [a] determination" as to whether the first
prong of the ascertainability requirement is satisfied.  867 F.3d at 446 (Fuentes, J., concurring).

*Marcus* and *Hargrove* provide useful guidance as to the second aspect of the ascertainability analysis. To recap, in *Marcus*, the plaintiff sought to certify a class of current and former owners and lessees of BMW vehicles with Bridgestone run-flat tires that had "gone flat and been replaced." 687 F.3d at 592. The court found that there were "serious ascertainability issues." *Id.* at 593. First, BMW could not identify which vehicles had Bridgestone run-flat tires because BMW did not have a parts manifest and not every car that came into a dealership with Bridgestone run-flat tires necessarily left with the same tires. Defendant further represented that "even if the proper cars with proper tires could be identified, [the] defendants' records would not indicate whether all potential class members' Bridgestone [run-flat tires] 'have gone flat and been replaced,' as the class definition requires." *Id.* at 594. Moreover, the *Marcus* court cautioned against ascertaining the class using only "potential class members' say so," such as having class members submit affidavits that their Bridgestone run-flat tires had gone flat and been replaced, because such a method may not be "proper or just" to the defendants. *Id.* (internal citation omitted).[6]

In *Hargrove*, the plaintiffs sought to certify a class of drivers who performed deliveries on a full-time basis using one truck for mattress retailer Sleepy's. 974 F.3d at 469. The plaintiffs alleged that (1) Sleepy's had misclassified them as independent contractors, and because they were actually employees, Sleepy's violated the NJWPL by making certain pay deductions; and (2) Sleepy's violated the NJWHL by failing to pay the drivers overtime when they worked more than 40 hours per week. *Id.* at 472. The *Hargrove* court found that the proposed class of delivery drivers who worked full-time for Sleepy's was ascertainable because the plaintiffs had produced

---

[6] The Third Circuit has since made clear that affidavits "*in combination with records or other reliable and administratively feasible means*, can meet the ascertainability standard." *Hargrove*, 974 F.3d at 470 (quoting *City Select*, 867 F.3d at 441) (emphasis added).

"thousands of records from Sleepy's and [] explained how they can use them to identify individual drivers who worked full-time." 974 F.3d at 480. Specifically, the plaintiffs produced testimony from a dozen potential class members stating that they were required to work exclusively for Sleepy's full-time; evidence that the drivers worked a minimum of 10 hours per day, and thus routinely worked over 40 hours per week; evidence that the drivers were wholly reliant on Sleepy's for their income; pay statements showing that delivery drivers completed multiple deliveries each day for five to six days a week; delivery manifests listing the driver and how many deliveries they were assigned each day; driver rosters; and Sleepy's security gate logs showing who drove the truck through the gate each day. *Id.* at 479. The plaintiffs then demonstrated how they could cross-reference gate logs, driver rosters, and pay statements to show that the putative class members worked full-time and overtime for Sleepy's. *Id.* at 472-73. Thus, the court in *Hargrove* found that the plaintiffs "identified several distinct data sets that, taken together with the affidavits, establish a reliable and administratively feasible mechanism for determining class membership." *Id*. at 480 (internal quotation omitted).

Here, Plaintiffs must demonstrate by a preponderance of the evidence that they can ascertain the persons who (1) performed driver and/or helper functions for Defendants out of the Facilities during the class period, (2) did not have direct contracts with either Defendant, and (3) worked more than 40 hours per week performing deliveries for Defendants. The Court previously found that although Plaintiffs proposed methods appeared sufficient, Plaintiffs needed to provide "evidence of [] actual records or data so that their stated methods can actually be employed," or evidence "show[ing] the *amount and extent of that work* as a matter of just and reasonable inference." D.E. 100 at 22 (emphasis added). Plaintiffs have now submitted a sample of records that they contend "provide a very strong basis from which the class can be ascertained." Br. at 13.

17

The Court disagrees.

At the outset, while relying on a variety of Defendants' documents, Plaintiffs failed to elicit any testimony during depositions to confirm the meaning of the documents. For example, the "All Teams" tabs of XPO's spreadsheets list drivers and helpers next to their Carriers. D.E. 132-4, D.E. 132-5. These tabs ostensibly show the individuals who contracted with the listed Carriers to render services to XPO, but Plaintiffs never confirmed that fact through witness testimony. The same applies to XPO's background check forms, drug and alcohol testing release forms, and identification badges. D.E. 132-12, D.E. 132-13, D.E. 132-14. Plaintiffs also submitted samples of XPO spreadsheets apparently setting forth the date of delivery, name of the Carrier, individuals assigned to the delivery, truck number, warehouse location, distance of delivery, number of stops, and time it took to make the delivery. D.E. 132-3. But again, Plaintiffs failed to confirm, through witnesses with personal knowledge, that the submitted spreadsheets actually reflect the information for which they are being offered. Of course, depositions are often used to establish the appropriate foundation for key documents, but for reasons unknown, Plaintiffs failed to do so here. Additionally, it is unclear whether the XPO spreadsheets show information for past deliveries that were completed or for future planned deliveries which may have ultimately involved different drivers or helpers than those listed. This is an important distinction, as the record shows that Carriers retained the ultimate authority to assign delivery teams and sometimes made "last-minute" adjustments to the delivery teams without involving XPO. *See*, *e.g.*, D.E. 87-18, Ballard Dep. at 138:12-25; D.E. 90-3, Condon Decl. at ¶¶ 43-47, 70. At a minimum, Plaintiffs would have to establish how much variation existed between the spreadsheets and actual deliveries. Similarly, Plaintiffs failed to depose any witnesses regarding the emails sent by XPO employees listing driver route assignments and performance scores. D.E. 132-6. Thus, the Court cannot confirm that the

documents provided can be used to identify the individuals who performed deliveries out of the Facilities during the class period and how many hours per week those individuals worked for Defendants.[7]

More importantly, while the submitted records may establish which drivers and helpers made deliveries for Defendants, they do not show which drivers and helpers worked overtime. At a minimum, Plaintiffs have not demonstrated that the records reflect a reliable and administratively feasible mechanism to determine who worked in excess of 40 hours in a given week. For instance, the XPO spreadsheets may show the time spent on a delivery route on any given day. D.E. 132-3. However, Plaintiffs have not shown that they can cross-reference the spreadsheets for any given week (much less that it is administratively feasible to do so) to ascertain which individuals spent over 40 hours per week performing deliveries for Defendants out of the Facilities. Similarly, Plaintiffs have not demonstrated how they can use the XPO emails listing the drivers assigned to various routes and collecting driver performance scores for a specified date range to ascertain class membership. D.E. 132-6. Relying on these spreadsheets and emails is particularly problematic because, as mentioned above, the Carriers sometimes made "last-minute" adjustments to the delivery teams without XPO's involvement. And given the current record, the Court is left to guess how often these adjustments occurred. Accordingly, using the spreadsheets and emails to determine class membership implicates a variety of issues that render it "impossible to identify [class members] without extensive and individualized fact-finding." *Marcus*, 687 F.3d at 593.[8]

---

[7] The Court does not go so far as to endorse Defendants' view that the XPO documents submitted lack "*any* [] indicia of reliability." Opp. at 20 (emphasis added). Indeed, they were submitted by XPO in discovery and apparently relied on to conduct XPO's business activities.

[8] To be clear, Plaintiffs must show that they can ascertain those drivers and helpers who worked over 40 hours per week. Those drivers and helpers will be part of the class. The related, but distinct, inquiry as to how many overtime hours each driver or helper worked in a week was

Plaintiffs have not met their burden of demonstrating that it is administratively feasible to piece together the records to identify which individuals worked over 40 hours per week for Defendants.

Plaintiffs rely extensively on *Hargrove* to argue that they have satisfied the ascertainability requirement.  *See* Br. at 10-12; Reply at 7-9, 12-15.  However, *Hargrove* is readily distinguishable.  As noted above, in *Hargrove*, the plaintiffs sought to certify a class for their claims that Sleepy's misclassified them as independent contractors instead of actual employees, and that Sleepy's violated the NJWHL by failing to pay them overtime.  974 F.3d at 472.  But in *Hargrove*, the class members worked full-time for Sleepy's and regularly worked over 40 hours per week.[9]  *Hargrove*, 974 F.3d at 479 (referring to the plaintiffs' evidence demonstrating that class members "were required to work exclusively for Sleepy's full-time.  It set delivery routes that ran about 10 hours each day.  Because of this 10-hour minimum workday, the drivers routinely worked more than 40 hours per week.").  Here, in contrast, Plaintiffs apparently worked for the Carriers and only some of that work included making deliveries for Defendants.  In other words, once the plaintiffs in *Hargrove* provided sufficient evidence to ascertain the putative class of drivers, they necessarily

---

addressed in the Court's prior Opinion, D.E. 100, as to predominance.  In other words, so long as Plaintiffs can provide sufficient evidence to ascertain those drivers or helpers who worked over 40 hours per week, the fact that the amount of overtime varied among Plaintiffs will not change the Court's findings as to predominance.

[9] While the proposed class in *Hargrove* was defined as drivers who worked full-time for Sleepy's, rather than drivers who worked more than 40 hours per week, the inquiry of whether an individual worked overtime was essentially answered by the inquiry of whether that individual worked full-time: in order to identify which drivers worked full-time, the plaintiffs provided evidence showing that the potential class members worked a minimum of 10 hours per day for five to six days per week, or over 50 hours per week.  974 F.3d at 479.  Here, the fact that the putative class members apparently performed deliveries for companies other than Bob's and XPO throughout the class period, *see* Opp. at 13, complicates the inquiry of whether an individual worked more than 40 hours per week performing deliveries *for Defendants*.

demonstrated that those class members worked full-time and overtime.[10]  The same cannot be said here because Plaintiffs do not allege, or submit proof, that they only worked for Defendants. Here, Plaintiffs provided the Court with a cursory list of the records submitted but failed to connect the dots for even a single class member demonstrating how the records can be used to identify which individuals worked over 40 hours per week for Defendants during the class period.[11]

Thus, although "[p]laintiff[s] need not, at the class certification stage, demonstrate that a single record, or set of records, conclusively establishes class membership," Plaintiffs here have not met their burden of proving, by a preponderance of the evidence, that there is a reliable and administratively feasible mechanism for determining class membership. *City Select*, 867 F.3d at 441 (emphasis added) (citing *Byrd*, 784 F.3d at 163).[12]

### IV. CONCLUSION

For the reasons stated above, and for good cause shown, Plaintiffs' motion for class

---

[10] In fact, the plaintiffs in *Hargrove* excluded from the class a driver who did not work full-time for Sleepy's and also worked to narrow the class definition so that it did not include similar drivers for whom the plaintiffs lacked sufficient records. *Id.* at 481.

[11] To Defendants' argument that Plaintiffs offer "cherry-picked" data from select dates within the class period, Plaintiffs have represented that they submitted samples of 276 spreadsheets produced by Defendants, are prepared to submit all of the spreadsheets produced.  Reply at 9-13.  The Court does not find problematic "gaps in the record" resulting from an incomplete set of spreadsheets, as those gaps "do not undermine the conclusion that all the evidence taken together could at the merits stage be used to determine who the [class members] [a]re." *Hargrove*, 974 F.3d at 480. Instead, the Court finds problematic that Plaintiffs have not shown how the information can be used to identify drivers and helpers who worked over 40 hours in a week for Defendants.

[12] Records from the Carriers may have been used to show which drivers and helpers performed delivery services out of the Facilities for over 40 hours per week during the class period.  However, despite the Court's suggestion, D.E. at 22, Plaintiffs apparently have not acquired such information.  Additionally, as noted above, affidavits "in combination with records or other reliable and administratively feasible means, can meet the ascertainability standard." *Hargrove*, 974 F.3d at 470 (quoting *City Select*, 867 F.3d at 441).  Plaintiffs have also failed to submit any affidavits in support of their ascertainability argument.

certification (D.E. 132) is **DENIED** without prejudice.  An appropriate Order accompanies this Opinion.

Dated: October 28, 2021

_____
John Michael Vazquez, U.S.D.J.