<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| OMAR A. ESPINAL, FREDY O. CARBAJAL, ARLEN Y. MARTINEZ, OSCAR RENE CALDERON ROMERO and WELLINGTON TORRES, <br><br> Plaintiffs, <br><br> v. <br><br> BOB'S DISCOUNT FURNITURE, LLC, RXO LAST MILE, INC., ABC CORPS., and JANE & JOHN DOES, <br><br> Defendants. | Civil Action No. 17-02854 <br><br> **OPINION** <br><br> March 7, 2025 |

**SEMPER**, District Judge.

This action arises from allegations that Defendants failed to pay overtime to Plaintiffs. Plaintiffs Omar A. Espinal, Fredy O. Carbajal, Arlen Y. Martinez, Oscar Rene Calderon Romero, and Wellington Torres, on behalf of themselves and all others similarly situated (collectively "Plaintiffs"), assert claims in their Third Amended Complaint ("TAC") against Defendants Bob's Discount Furniture ("Bob's") and RXO Last Mile, Inc. ("RXO LM") for violations of the New Jersey Wage and Hour Law ("NJWHL"), N.J. Stat. Ann. § 34:11-56a, et seq.; the New Jersey Wage Payment Law ("NJWPL"), N.J. Stat. Ann. § 34:11-4.1, *et seq.*; and for unjust enrichment. (ECF 122.)

Presently pending are three separate motions: (1) Plaintiffs' motion for summary judgment (ECF 191); (2) Bob's motion for summary judgment (ECF 192); and (3) RXO's motion for

summary judgment. (ECF 196.) The Court has decided this motion upon the submissions[1] of the parties, without oral argument, pursuant to Federal Rule of Civil Procedure 78 and Local Rule 78.1. For the reasons stated below, Plaintiffs' motion for summary judgment is **DENIED,** Bob's motion for summary judgment is **GRANTED**, and RXO's motion for summary judgment is **DENIED**.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY[2]

Plaintiffs seek to recover damages from Bob's and RXO LM for alleged violations of the NJWHL, the NJWPL, and the doctrine of unjust enrichment. (*See* TAC.)

Defendant Bob's is a limited liability company that sells furniture in retail stores and online. (ECF 122, TAC ¶¶ 19-20; ECF 194, Bob's SOMF ¶ 2.) Defendant RXO LM is a "third-party provider of end-to-end goods management and logistics services for companies such as Bob's." (TAC ¶ 22.) Named Plaintiffs are five individuals who allegedly worked as drivers and helpers for Defendants for varying periods between May 2012 and June 2018. (*Id*. ¶¶ 14-18, 28.)

Many items purchased by customers online or in Bob's retail stores do not require home delivery. (Bob's SOMF ¶ 3.) However, Bob's offers delivery services to its customers with each transaction. (ECF 191-1, PSOMF ¶ 2.) For customers who request home delivery, Bob's contracts with freight forwarders, like RXO LM, to arrange for delivery of the furniture because Bob's does not itself perform deliveries. (Bob's SOMF ¶ 4.)

---

[1] The submissions consist of: (1) Plaintiffs' motion, (ECF 191-2, "Pl. MSJ. Br."), Defendants' respective opposition briefs, (ECF 198, "Bob's Opp. Br."; ECF 202, "RXO Opp. Br."), and Plaintiffs' reply (ECF 206, Pl. Rep. Br.); (2) Bob's motion, (ECF 193, "Bob's MSJ. Br."), Plaintiffs' opposition (ECF 200, Pl. Bob Opp.), and Bob's reply (ECF 208, Bob's Rep. Br.); (3) RXO LM's motion, (ECF 196, "RXO MSJ. Br."), Plaintiffs' opposition (ECF 201, Pl. RXO Opp.), and RXO LM's reply (ECF 209, RXO Rep. Br.); and (4) the parties' submissions regarding material facts (ECF 191-1, Plaintiffs' Statement of Material Facts "PSOMF"; ECF 194, Bob's Statement of Material Facts "Bob's SOMF"; ECF 196-2, RXO LM's Statement of Undisputed Material Facts "RXO SOMF").

[2] The facts and procedural history are drawn from the TAC, the submissions listed *supra*, and documents integral to or relied upon by the TAC. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

RXO LM—formerly known as XPO Last Mile, Inc.[3]—is an authorized freight forwarder that facilitates deliveries of large footprint goods (e.g., furniture, appliances, etc.) on behalf of retailers (its "Clients") to the customers who purchase them. (ECF 196-2, RXO SOMF ¶ 1.) Until November 2, 2021, and during the relevant period, Bob's was an RXO LM Client. (*Id*. ¶ 3.)

The contractual relationship between Bob's and RXO was set forth in a Master Delivery Operation Service Agreement ("MDOSA"), which in part states that "[a]ll personnel, including employees of XPOLM shall be deemed employees of XPOLM and shall not be considered employees of Bob's for any purpose whatsoever." (Bob's SOMF ¶¶ 14-15.) The MDOSA further provides that "XPOLM shall have exclusive control and direction of Personnel providing the Services." (*Id*. ¶ 16.)

In practice, Bob's organized orders from its customers into geographically efficient routes and asked RXO LM to facilitate deliveries of the truckloads using registered motor carriers ("Contract Carriers" or "Carriers"). (RXO SOMF ¶ 4.) The Carriers contracted directly with RXO LM to perform delivery services and employed drivers and helpers (i.e., Plaintiffs and the Class) to complete deliveries that the Carriers accepted from RXO LM. (*Id*. ¶¶ 9-10.) The deliveries in this case originated out of two warehouses in New Jersey— a warehouse in Edison (the "Edison Facility") from April 26, 2015 through January 2017 and a warehouse in Carteret (the "Carteret Facility") from May 1, 2017 through approximately November 2, 2021. (*Id*. ¶¶ 5-7.)

Plaintiffs and the Class were employed by the Carriers,[4] and each of the Plaintiffs were paid directly by the Carriers. (*Id*. ¶¶ 10, 16, 23, 37, 39-42.) No Plaintiff or Class Member had a

---

[3] The record references "XPO", "XPO LM", "XPOLM", and "RXO LM". Unless otherwise noted the names all refer to the same company and are thus interchangeable.

[4] Omar Espinal ("Espinal") was hired and performed deliveries for S.S. Express Trucking, LLC during the times relevant to this action. (RXO SOMF ¶ 17.) Fredy Carbajal ("Carbajal") was hired and performed deliveries for EGV Trucking LLC. (*Id*. ¶ 18.) Arlen Martinez ("Martinez") was hired and performed deliveries for BVC Expresso LLC, TIN Transportation, EGV Trucking LLC, and Fredy's Trucking LLC. (*Id*. ¶ 19.) Oscar Rene Calderon

written contract or agreement with RXO LM. (*Id.* ¶ 22.) The contractual relationship between RXO LM and the Carriers is reflected in a standardized Delivery Service Agreement (the "DSA"). (*Id.* ¶ 10; Bob's SOMF ¶ 17.) The DSA provides that a "Contract Carrier shall have the sole control over the manner and means of performing its obligations under this Agreement." (Bob's SOMF ¶ 18.) The DSA give the Carriers "complete and exclusive direction and control over [the Carrier's] employees," and the Carriers "[a]ssume sole responsibility . . . for compliance with all applicable laws, rules and regulations, including but not limited to wage and hour laws . . . and all laws relating to employment such as orders respecting payroll deductions and maintenance of payroll and employment records . . . ." (*Id.* ¶ 19.)

On April 26, 2017, Plaintiff Espinal filed a putative class action Complaint against Bob's, XPO LM, "ABC Corps," and "Jane and John Does." (ECF 1.) On June 3, 2019, Plaintiffs filed a Second Amended Complaint, which removed Gonzalez as a named Plaintiff and amended the proposed class definition again. (ECF 74.) On January 21, 2021, Plaintiffs filed a Third Amended Complaint (ECF 122), which is the operative complaint, alleging that Bob's and XPO LM jointly employed the Plaintiffs, and that "[t]he Plaintiffs and Class Members are not independent contractors as defined by N.J. Stat. Ann. § 43:21- 19(i)(6)(A)(B)(C)." (*Id.* ¶¶ 26, 27, 33.)

Following class discovery, Plaintiffs filed three motions for class certification, the third of which, (ECF 155), was granted. (ECF 165.) On January 26, 2023, the Court certified the following class:

> All individuals that were based out of Defendants' Edison and Carteret, New Jersey warehouses that performed truck driving and/or helper functions for the Defendants from April 26, 2015 through to January 2017 out of the Edison Facility and from May 1, 2017 through to the present out of the Carteret Facility, who did not

---

("Calderon") was hired and performed deliveries for CAAD Trucking, Inc. and SLG Systems, Inc. (*Id.* ¶ 20.) Wellington Torres ("Torres") was hired and performed deliveries for S.S. Express, LLC and SAAAM, LLC. (*Id.* ¶ 21.)

have direct contracts with either Defendant, and who worked more
than forty hours per week performing deliveries for Defendants.

(ECF 165 at 1-2, 18.) Only the overtime claim (NJWHL) was certified because Plaintiffs chose

not to seek certification on their unlawful deductions claim (NJWPL). (*See id.*)

Plaintiffs now move for summary judgment requesting the Court find Plaintiffs and class

members were misclassified by Defendants as non-employees, that Plaintiffs and class members

are Defendants' employees, and that Defendants improperly deprived Plaintiffs of overtime wages

in violation of the NJWHL. (ECF 191.) Bob's and RXO LM respectively move for summary

judgment seeking dismissal of all claims asserted against them. (ECF 192; ECF 196.)

## II.    <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted

if the movant shows that "there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law." *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d

Cir. 2000); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a

motion for summary judgment, a court must construe all facts and inferences in the light most

favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir.

1998) (citing *Peters v. Del. River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)).

The moving party bears the burden of establishing that no genuine issue of material fact

remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on

which the nonmoving party bears the burden of proof . . . the burden on the moving party may be

discharged by 'showing' — that is, pointing out to the district court — that there is an absence of

evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more

than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23). Moreover, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48.

## III.   **<u>ANALYSIS</u>**

### a.  **Overview of the Parties' Arguments**

Plaintiffs filed this action nearly seven years ago. The record is voluminous with over 200 docket entries since the matter's inception. Here, the parties have all filed motions for summary judgment, each containing nuanced arguments with thousands of pages of discovery, exhibits, and other material information. As a result of these voluminous filings, the Court now briefly recounts and distills each party's arguments.

Plaintiffs allege that Defendants improperly misclassified class members as non-employees and deprived them of overtime wages in violation of the NJWHL. (Pl. MSJ. Br. at 2.) Plaintiffs contend that public policy requires an "expansive" interpretation of the NJWHL and that the Court should apply the "ABC" test to determine that Plaintiffs were Defendants' employees. (*Id.* at 4-6.) However, even if the Court uses the joint employment test set forth in *In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litigation*, 683 F.3d 462, 469 (3d Cir. 2012), Plaintiffs submit that summary judgment should be entered against Defendants.

Bob's argues there is no genuine dispute as to any material facts that would establish Bob's was Plaintiffs' joint employer, or that Bob's was unjustly enriched. (Bob's MSJ. Br. at 1-2.) Substantively, Bob's contends that the *Enterprise* test controls based on the relevant caselaw and this Court's prior ruling in this case from October 14, 2020.[5] Under an exhaustive review of the record evidence using the *Enterprise* factors, Bob's submits that "no reasonable jury could conclude Bob's was Plaintiffs' joint employer." (*Id.* at 18.) Bob's also argues that Plaintiffs' unjust enrichment claim fails as a matter of law because it is undisputed that Plaintiffs were employees of the Carriers, there was no direct relationship between Bob's and Plaintiffs or any mistake about how Plaintiffs were to be compensated. (*Id.* at 34-35.)

RXO LM also contends there is no genuine dispute as to any material facts that would establish RXO LM was Plaintiffs' joint employer. (RXO MSJ. Br. at 1-2.) RXO LM similarly relies on the Court's prior ruling with respect to the applicability of the *Enterprise* test, and using the *Enterprise* factors, RXO LM asserts that it does not meet any of the requirements of a joint employer. (*Id.* at 14.) Finally, RXO LM argues Plaintiffs' unjust enrichment claim fails as a matter

---

[5] (*See* ECF 100, "JMV October 14 Opinion" at 9.)

of "quasi-contract" law as no Plaintiff or member of the Class ever contracted with RXO LM. (*Id.* at 29-30.)

### b. New Jersey Wage and Hour Law

According to Plaintiffs, Bob's and RXO LM were their employers, as defined by the NJWHL. The ultimate validity of this assertion is the crux of Plaintiffs' claim as only an "employer" can be liable for violations of the NJWHL and NJWPL. *See* N.J. Stat. Ann. § 34:11-56a1(g) and N.J. Stat. Ann. § 34:11-4.1(a) (defining "Employer").

The NJWHL is designed to "protect employees from unfair wages and excessive hours." *Hargrove v. Sleepy's, LLC*, 106 A.3d 449, 458 (N.J. 2015) (internal citation omitted). It "establishes not only a minimum wage but also an overtime rate for each hour of work in excess of forty hours in any week for certain employees. It does not prescribe the minimum wage or overtime rate payable to independent contractors." *Id.* (internal citation omitted). Under the NJWHL, an "employee" is defined as "any individual employed by an employer." N.J. Stat. Ann. § 34:11-56a1(h). The law defines an "employer" as "any individual, partnership, association, corporation, and the State and any county, municipality, or school district in the State, or any agency, authority, department, bureau, or instrumentality thereof, or any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee." *Id.* § 34:11-56a1(g).

Here, Plaintiffs allege that Defendants improperly misclassified them and the class members as non-employees and deprived them of wages in violation of the NJWHL. (Pl. MSJ. Br. at 28.) It is undisputed that Plaintiffs were not independent contractors.[6] Furthermore, it is

---

[6] (*See* ECF 100, JMV October 14 Opinion at 9-10 ("Here, that issue is not disputed—Defendants concede that 'Plaintiffs and the putative class are not independent contractors.'"); *see also* ECF 122, TAC ¶ 33; ECF 124, "Bob's Answer to TAC" ¶ 33.).

undisputed that Plaintiffs were hired and employed by the various Carriers for whom they provided trucking services. (*See supra* at 3 fn. 4; *see also* Bob's SOMF ¶¶ 9-13, 67-84.) Therefore, to recover on their wage claims, Plaintiffs must prove that Bob's or RXO LM was their joint employer.

### c.  Application of ABC Test vs. Joint Employer "Enterprise Test"

The parties disagree as to the applicable test in determining whether the drivers and helpers were misclassified by Defendants and were in fact employees. Plaintiffs assert that "[i]n New Jersey, the appropriate test to determine whether Plaintiffs and the class members are Defendants' employees is the three-part ABC test." (Pl. MSJ. Br. at 11.) Conversely, Bob's and RXO LM contend the Joint Employer Test articulated in *Enterprise* controls. (Bob's MSJ. Br. at 14-18; RXO MSJ. Br. at 8-13.) As a starting point, the Court looks to its prior ruling:

> In *Hargrove*, the New Jersey Supreme Court held that "the 'ABC' test derived from the New Jersey Unemployment Compensation Act . . . governs whether a plaintiff is an employee or independent contractor for purposes of resolving a wage-payment or wage-and-hour claim." 106 A.3d at 453 (emphasis added). The ABC Test is properly applied to ascertain whether a worker should be considered an employee or an independent contractor. Here, that issue is not disputed – Defendants concede that "Plaintiffs and the putative class are not independent contractors." Instead, the question raised is whether Plaintiffs are employees of Defendants. To resolve that inquiry, the joint employer test announced in [*Enterprise*] is the proper test to apply.

(ECF 100, JMV October 14 Opinion at 9-10.)

Despite Plaintiffs' assertions, the Court's prior decision to apply the Joint Employer Test was not "dicta." (Pl. MSJ. Br. at 6.) The ruling was central to the determination of Plaintiffs' certification motion, their subsequent certification motions, and to the ultimate disposition of the

case.[7] *See Mt. Hawley Ins. Co. v. Swift Constr., LLC*, No. 15-2187, 2018 WL 1542153, at *5 (D.N.J. Mar. 29, 2018) (holding that the substance of the [Court's] opinion is not dicta.[8] Indeed, after extensive briefing by the parties in 2020, including whether passage of the New Jersey Wage Theft Act ("WTA"), N.J. Stat. Ann. § 34:11-58.1 to -58.6 mandated application of the "ABC" test – the Court rejected Plaintiffs' arguments that the WTA and ABC test control.[9]

As such, the Court's prior finding that the "joint employment test is the correct measure" is the law of the case. *See, e.g., D'Antonio v. Borough of Allendale*, No. 16-816, 2021 WL 1221010, at *12 n.12 (D.N.J. Mar. 31, 2021) ("The law of the case doctrine provides that once a court makes findings on an issue in a case, the law of that case will not be disturbed by that court unless it appears that there are compelling reasons to do so.") (internal quotations omitted); *SEC v. Lucent*, No. 04-2315, 2006 WL 2168789, at *5 (D.N.J. June 20, 2006) ("Under law of the case doctrine, when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case.") (internal quotations omitted). Here, the Court sees no compelling reason to disturb the Court's prior ruling[10] and applies the Joint Employer Test in ultimately determining the present motions for summary judgment.

---

[7] The test applied ultimately determines which party bears the burdens of proof. Plaintiffs have pressed for application of the ABC Test because under that test, a worker is presumed to be an employee (as opposed to an independent contractor) and the burden is on the alleged hiring entity to demonstrate otherwise. Defendants, conversely, prefer the Joint Employer Test because the Plaintiffs retain the burden of proof, and must establish joint employment liability. *See Enterprise*, 683 F.3d at 469-70.

[8] *See Mt. Hawley Ins. Co. v. Swift Constr., LLC*, No. 15-2187, 2018 WL 1542153, at *5 (D.N.J. Mar. 29, 2018) (holding that the substance of the [Court's] opinion is not dicta. Dicta are judicial comment[s] made while delivering a judicial opinion, but one[s] that [are] unnecessary to the decision in the case and therefore not precedential.") (citing *United States v. Dupree*, 617 F.3d 724, 740 (3d Cir. 2010)).

[9] (*See* ECF 87-2 at 18-20 (Plaintiffs arguing that the passage of the NJWTA "reconfirmed" that there is "no pre-ABC test threshold inquiry" of employment status "prior to application of the ABC test"); ECF 90 at 33-34 (Defendants arguing that the NJWTA does not mention the ABC Test and that no parallels can be drawn between it and the ABC Test); ECF 91 at 3 (Plaintiffs' arguing that the NJWTA abrogates two analogous cases that applied the Joint Employer Test); ECF 100 at 9-10 (the Court adopting the Joint Employer Test).)

[10] Notably, Plaintiffs' arguments relying on *Hargrove* are misplaced given the context present here. *Hargrove* does not discuss which test a court should use to determine who employed a given plaintiff. *Echavarria v. Williams Sonoma, Inc.*, No. 15-6441, 2016 WL 1047225 (D.N.J. Mar. 16, 2016). Rather, the *Hargrove* plaintiffs had each signed an Independent Driver Agreement directly with the defendant, who classified them as independent contractors. *Id.*

**d. Joint Employer "*Enterprise*" Test**

Plaintiffs argue that even if the Court applies the *Enterprise* test, "Plaintiffs and the class members are Defendants' Employees." (Pl. MSJ. Br. at 28.) Bob's and RXO LM assert that no reasonable jury could conclude Bob's or RXO LM were Plaintiffs' joint employer, and therefore, they are respectively entitled to summary judgment. (Bob's MSJ. Br. at 18; RXO MSJ. Br. at 14.)

In *Enterprise*, the Third Circuit explained that two parties may be joint employers if they exercise "significant control" over their workers. *Enterprise*, 683 F.3d at 468. The primary factors the Court considers under the Joint Employer Test are the alleged employer's "(1) authority to hire and fire employees; (2) authority to promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; (3) day-to-day supervision, including employee discipline; and (4) control of employee records, including payroll, insurance, taxes, and the like." (ECF 100, JMV October 14 Opinion at 10) (quoting *Enterprise*, 683 F.3d at 469); *see Yu v. McGrath*, 597 F. App'x 62, 66 (3d Cir. 2014). These factors should not be "blindly applied," rather courts "must instead consider all the relevant evidence, including evidence that does not fall neatly within one of the above factors." *Enterprise*, 683 F.3d at 469.

Considering the record, Bob's compellingly argues that no reasonable jury could find that Bob's was Plaintiffs' joint employer. However, after a "consideration of the total employment situation and the economic realities of the work relationship" the Court is not convinced that no reasonable jury could find that RXO LM was Plaintiffs' employer. *Enterprise*, 683 F.3d at 469.

**i. Bob's *Enterprise* Factors**

**1. Authority to Hire or Fire**

According to Plaintiffs, the "MDOSA permits RXO to engage contract carriers" and the "MDOSA requires RXO to ensure that Plaintiffs and the class members undergo background

checks based upon a 'criminal background matrix.'"[11] (Pl. MSJ. Br. at 30-31.) Relevant to the first factor, Plaintiffs submit that Bob's flags poor performing drivers/helpers to RXO LM and "routinely stated to RXO that it must find new drivers/helpers to replace low performers." (*Id*. at 31; PSOMF ¶¶ 54, 98.)

Despite Plaintiffs' assertions, the record evidence belies the contentions that Bob's had the authority to hire or fire the Plaintiffs. As a starting point, Bob's did not hire or fire any drivers or helpers working out of the Edison or Carteret facility. (Bob's MSJ. Br. at 19; Bob's SOMF ¶ 65.) The record evidence supports that Plaintiffs were hired by the various Carriers for whom they provided trucking services. (Bob's SOMF ¶¶ 67-84.) Furthermore, even if Bob's were to request the discontinued use of a particular delivery team, the Carrier was not obliged to terminate that delivery team. (*Id*. ¶ 86.) Indeed, the record evidence shows that none of the Plaintiffs were terminated by Bob's. Rather, the Plaintiffs stopped working out of the Edison and Carteret Facilities for various reasons. (Bob's SOMF ¶¶ 68, 71, 75, 80-81, 84.)

The first factor of the *Enterprise* test weighs in Bob's favor.

### 2. Authority to Promulgate Work Rules or Assignments, or Set Conditions of Employment, Including Compensation, Benefits, and Hours

Plaintiffs argue the second factor of the Enterprise test weighs in their favor because Bob's required RXO LM "to perform consistent with its best practices and standard operating procedures and comply with twenty-nine (29) enumerated delivery operation requirements." (*See* PSOMF ¶¶ 17-23.) Bob's also required Plaintiffs and the class members to undergo background checks and clear a drug test prior to making deliveries. (*Id*. ¶¶ 35-40.) Furthermore, Plaintiffs identify an exhaustive list of procedures Bob's required with respect to delivery, installation, monitoring of

---

[11] *See Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 423 (S.D.N.Y. 2017) (requiring agents hired by subcontractor to complete background checks does not demonstrate control over the hiring process).

work, utilization of computer software programs, and more. (Pl. MSJ. Br. at 32-33; PSOMF ¶¶ 41-49, 50-57, 64-65, 77-79, 103-112.)

Despite Plaintiffs' assertions, the record evidence shows that Bob's did not have the authority to set the drivers' and helpers' compensation, benefits, work schedules, rates, or methods of payment. *Enterprise*, 683 F.3d at 471.[12] (Bob's SOMF ¶¶ 88, 101.) The drivers and helpers were paid by the Carriers. (*Id.* ¶ 89.) Likewise, it was not Bob's responsibility to keep track of the nature and amount of any expenses incurred by or reimbursements provided to the drivers and helpers. (Bob's MSJ. Br. at 22; Bob's SOMF ¶ 104.) Further, Bob's did not determine the hours or days of the week any driver or helper at the Edison or Carteret Facilities worked. (Bob's SOMF ¶ 106.) Thus, even if the amount of work drivers and helpers performed on a given day was based on the number of deliveries to be made to Bob's customers, the Carriers had control over the amount of work each driver performed by controlling the number of drivers and helpers it hired, and the number of drivers scheduled to work each day. *Enterprise*, 683 F.3d at 471.[13] (*Id.* ¶¶ 107-08.) Finally, Bob's did not own the trucks used to make deliveries of merchandise to customers (and not all of the trucks had Bob's logo on it), nor did Bob's train drivers or helpers working out of the Edison and Carteret Facilities.[14] (Bob's MSJ. Br. at 22-24; Bob's SOMF ¶¶ 110-14, 119.)

While Plaintiffs do assert some level of authority for Bob's to promulgate work rules and preferences as to RXO LM (and by proxy) the drivers and helpers, the record evidence is devoid of any showing that Bob's had any more authority over the conditions of employment "than would

---

[12] *See also Molina v. Hentech, LLC*, 2015 WL 1242790, at *7 (M.D. Fla. Mar. 18, 2015) (finding lack of power to set drivers' pay rates or payment methods weighed against finding joint employer status).

[13] *See also Molina*, 2015 WL 1242790, at *7 (finding entity that provided delivery drivers controlled their conditions of employment).

[14] *See Layton v. DHL Exp. (USA), Inc.*, 686 F.3d 1172, 1180 (11th Cir. 2012) ("Because Drivers were not dependent on DHL to provide vans so that they could accomplish their core duty—delivering packages—we find that this factor weighs against a finding of joint employment."); *see also* Montoya, 2014 WL 3385116, at *5 (finding retailer did not train delivery drivers under similar facts).

a third-party consultant who made suggestions for improvement" or had the authority to meaningfully set conditions of employment, including compensation, benefits, and/or hours. *Enterprise*, 683 F.3d at 471.

The second factor of the *Enterprise* test weighs in Bob's favor.

### 3. Day-to-Day Employee Supervision

Plaintiffs next contend that Bob's had day-to-day supervision over and the ability to discipline Plaintiffs and the class members through: (1) Bob's app allowing RXO personnel to monitor deliveries "on a screen" to keep track of location, timeliness and ensure customer satisfaction (PSOMF ¶ 49); (2) Bob's requirement that RXO assign daily routes based upon its performance metrics (*id*. ¶ 57); and (3) "[s]tandup meetings" held every morning at the Edison and Carteret facilities at which Bob's personnel were in attendance (*id*. ¶¶ 58-59).

Despite Plaintiffs' assertions, the record evidence contradicts Plaintiffs' contentions and provides significant attenuation between the purported day-to-day conduct between Bob's and the drivers and helpers. Notably, the MDOSA between XPO LM and Bob's provides that "XPOLM shall have the sole right and obligation, exercising its own independent discretion and judgment, to supervise, manage, direct, procure, perform or cause to be performed all Services to be provided by XPOLM pursuant to this Agreement. No officer, agent or employee of BOB'S shall have the authority to direct XPOLM as to the manner or means employed to perform the Services." (Bob's SOMF ¶ 15.) The MDOSA further provides that "XPOLM shall have exclusive control and direction of Personnel providing the Services."[15] (*Id*. ¶ 16.)

---

[15] The MDOSA also contains certain provisions related to public safety, customer relations, quality control, and branding, including, for example, provisions related to background checks, displaying Bob's logo on apparel and trucks, and communicating with Bob's Customer Care Department. However, these contractual arrangements do not amount to supervision of the drivers' and helpers' work. *See Echavarria*, 2016 WL 1047225, at *4 (holding similar factors did not show furniture retailer exercised significant control over drivers and helpers); *Perez v. Access Bio, Inc.*, 2019 WL 3297297, at *7 (N.J. Super. Ct. App. Div. July 23, 2019) (holding that providing instructions to ensure work is done correctly and safely "does not rise to the level of control necessary to be an employer.").

Here, the plain language of the MDOSA combined with the record evidence makes it clear that Bob's was not empowered with, nor did it actually engage in, significant control or day-to-day employee supervision of the Plaintiffs. Bob's purported conduct which Plaintiffs use to bolster their claims of day-to-day supervision are in line with that of quality control measures and do not rise to the level of control constituting material day-to-day supervision.[16]

The third factor of the *Enterprise* test weighs in Bob's favor.

### 4. Control Over Employee Records

Finally, Plaintiffs argue they have satisfied the fourth factor of the Joint Employer Test because "Bob's clearly had control of Plaintiffs' and the class members' employee records, including highly detailed performance records." (Pl. MSJ. Br. at 35.) In support, Plaintiffs contend Bob's: (1) kept track of Plaintiffs' and the class members' performance metrics and ranked them on the following metrics: customer service, professionalism, completion, timeliness, and damaged products (PSOMF ¶¶ 50-57); (2) logged within their own customer care department issues Plaintiffs and the class members encountered while making deliveries (*id.* ¶¶ 75-76); and (3) utilized computer software programs containing data regarding Plaintiffs' and the class members' performance (*id.* ¶¶ 103-12).

Again, despite Plaintiffs' contentions, there is ample record evidence showing that Bob's did not exercise or maintain any control over employee records for the drivers and helpers. *Enterprise*, 683 F.3d at 471. None of the Plaintiffs had a written contract or agreement with Bob's, and none received an IRS Form W-2 or Form 1099 from Bob's. (Bob's SOMF ¶¶ 161-62.) Under

---

[16] *See also Martin*, 273 F. Supp. 3d at 427 ("That Sprint may have conducted or directed evaluations of field agents, monitoring their productivity and compliance, does not establish control, as such quality control efforts differ from day-to-day control."); *Jean-Louis v. Metro. Cable Comms., Inc.*, 838 F. Supp. 2d 111, 127 (S.D.N.Y. 2011) ("At most, the evidence shows that Time Warner provided the results of quality control assessments to Metro, discussed them on a general level in monthly meetings, and occasionally inquired about what Metro planned to do about the worst performing technicians. That evidence cannot justify an inference of joint employment.").

the MDOSA, XPO LM was to ensure that motor vehicle and criminal background checks were performed on the Carrier's employees (i.e. drivers and helpers), but Bob's did not provide the "criminal background matrix" referenced in the MDOSA, and Bob's did not maintain any records of the results of the background checks. (*Id.* ¶ 166.) Bob's also did not keep track of the number of hours a driver or helper worked nor did Bob's record the period of time between when drivers and helpers arrived at the Facilities in the morning and when they departed to make deliveries. (*Id.* ¶ 168.) Further, Bob's did not record the duration of time between when drivers and helpers arrived back at the Facilities after making their deliveries and when they left for the day. (*Id.* ¶ 169.) Finally, Bob's did not maintain records of the earnings of drivers and helpers, payroll records, or information regarding any withholdings or deductions to the drivers' and helpers' pay the Carriers may have made for things like benefits, insurance, or taxes. (*Id.* ¶ 170.)

The fourth factor of the *Enterprise* test weighs in Bob's favor.

### 5. Bob's *Enterprise* Factors Conclusion

As stated above, the *Enterprise* factors "do not constitute an exhaustive list of all potentially relevant facts," and the "total employment situation and the economic realities of the work relationship" should be considered. *Enterprise*, 683 F.3d at 469. After consideration and review of the total employment situation, the work relationship, and an exhaustive review of the *Enterprise* factors, the Court finds there is not an indicia of "significant control" present to suggest that Bob's was Plaintiffs' joint employer. *Id.* at 468. As a result, the evidence in this matter so favors Bob's that the Court concludes no reasonable juror could find that Bob's was the Plaintiffs' employer. Bob's motion for summary judgment is **GRANTED** as to Plaintiffs' NJWHL and NJWPL claims.

### ii.  RXO LM *Enterprise* Factors

RXO LM contends that under the joint employer test articulated in *Enterprise*, RXO LM did not employ Plaintiffs, and therefore is not liable pursuant to Plaintiffs' NJWHL and NJWPL claims.

### 1.  Authority to Hire or Fire

On the first factor, RXO LM states that it did not hire or fire the Plaintiffs. (RXO MSJ. Br. at 14-16.) However, RXO LM in fact had authority over the hiring of Plaintiffs as the MDOSA makes clear that RXO LM was permitted to hire class members. (PSOMF ¶¶ 17-24.) RXO LM further was required to ensure that Plaintiffs and the class members underwent background checks and cleared drug tests prior to commencing employment.[17] (*Id*. ¶¶ 35-40.) Therefore, this *Enterprise* factor weighs in favor of Plaintiffs.

### 2.  Authority to Promulgate Work Rules or Assignments, or Set Conditions of Employment, Including Compensation, Benefits, and Hours

On the second *Enterprise* factor, RXO LM argues that it did not set the "terms and conditions of the [Plaintiffs'] employment" but rather, the Carriers did. (RXO MSJ. Br. at 17.) Despite RXO LM's assertion, Plaintiffs correctly contend that the second factor weighs in Plaintiffs' favor because RXO LM had the authority to, among other things, promulgate work rules and assignments and set conditions of employment. Indeed, the record evidence in part shows that RXO LM: (1) monitored Plaintiffs' and the class members' work, developed and scored their performance metrics, and assigned them work based on their performance (PSOMF ¶¶ 50-57); (2) utilized computer software programs to track Plaintiffs' and the class members' performance (*id*.

---

[17] *Echavarria*, 2016 WL 1047225, at *6 (finding Defendant, a trucking logistics company, exercised "some authority" over the hiring of the Driver/Helper Plaintiffs by requiring that the Driver Helper/Plaintiffs fill out paperwork, by performing multiple background checks, and by disallowing the hiring of any drivers with insufficiently clean driving records).

¶¶ 103-12); (3) conducted daily, standup meetings during which meetings RXO LM discussed ongoing work issues, provided instructions on new products and installation, provided performance-related feedback, etc. (*id*. ¶¶ 58-63); (4) required Plaintiffs and the class members to perform work tasks in addition to delivery routes (*id*. ¶¶ 115-16). Based on the foregoing, RXO LM in fact promulgated work rules and set "certain" conditions of employment through its fairly comprehensive monitoring and direction of Plaintiffs and the class members throughout their employment, and as a result, this factor weighs in favor of Plaintiffs.[18]

### 3. Day-to-Day Employee Supervision

On the third *Enterprise* factor, RXO LM argues that they did not manage or discipline the Plaintiffs and "all disciplinary actions were left to the discretion of the Carriers." (RXO SOMF ¶ 75.) From a managerial perspective, there is evidence in the record that RXO LM: (1) maintained a dispatch office that Plaintiffs could call into if they encountered problems with deliveries (PSOMF ¶ 69); (2) RXO LM's dispatch, which received between 300-400 calls per day, "monitored the delivery trucks throughout the day and helped with any kind of problems that needed to be resolved" (*id*. ¶¶ 71-72); (3) RXO LM's dispatch called Plaintiffs depending on the progress that was monitored (*id*. ¶ 73); and (4) conducted daily, standup meetings during which RXO LM discussed ongoing work issues, provided instructions on new products and installation, provided performance-related feedback, etc.[19] (*Id*. ¶¶ 58-63.) Further, there is evidence in the record that RXO LM had authority to terminate Plaintiffs. (*Id*. ¶¶ 98-102.) For example, when presented with complaints regarding compensation, RXO responded that they "don't negotiate

---

[18] *Echavarria*, 2016 WL 1047225, at *6 (finding Defendant set "certain conditions" of employment by generating routes, addressing how Plaintiffs dressed for work, and requiring Plaintiffs to check in from the road)

[19] *Echavarria*, 2016 WL 1047225, at *6 (finding Defendant "manage[d]" Plaintiffs through evidence in the record that Defendant held "regular meetings on how the drivers should do their jobs")

with terrorists" and then fired "everybody." (*Id.*) Consequently, the third *Enterprise* factor weighs in favor of Plaintiffs.

### 4. Control Over Employee Records

On the final *Enterprise* factor, Plaintiffs contend RXO LM had control of Plaintiffs' employee records because RXO LM:

(1) Kept track of Plaintiffs' and the class members' performance metrics and ranked them on the following metrics: customer service, professionalism, completion, timeliness, and damaged products (PSOMF ¶¶ 50-57);

(2) Utilized computer software programs containing data regarding Plaintiffs' and the class members' performance, including: (a) the date of a delivery; (b) an alphanumeric code representing the truck or route number for the delivery; (c) the name of the class member who performed the delivery; (d) an identification number assigned to the class member; (e) the time at which the class member recorded (via a tablet or mobile device provided by Bob's) that they left the facility; and (f) the time at which the class member recorded returning to the facility (*id.*);

(3) Utilized a computer software program to document Plaintiffs' and the class members' personnel information, including, but not limited to, their date of birth, social security number, photograph, identification card, drug test record, background check record, start and end dates, consumer report disclosure statement, driver's license or other photo identification, and Social Security card image. (*Id.* ¶¶ 113-14.)

In response, RXO LM convincingly argues that RXO LM did not maintain or control employment, payroll, insurance, tax, or other material records of Plaintiffs. (RXO MSJ. Br. at 25-27.) Therefore, the fourth Enterprise factor weighs in favor of RXO LM.

### 5. RXO LM *Enterprise* Factors Conclusion

While the fourth factor weighs in favor of RXO LM, the other factors and relevant record evidence do not clearly favor RXO LM. *Echavarria*, 2016 WL 1047225, at *6. Therefore, after careful review and consideration of the "total employment situation and the economic realities of the work relationship[,]" the Court concludes that a reasonable jury could find that under the *Enterprise* test, RXO LM was Plaintiffs' joint employer. Consequently, based on RXO LM's

theory that it was not a joint employer under the *Enterprise* factors, RXO LM's motion for summary judgment is **DENIED**.

> ### 6. Statutory Exemption of N.J. Stat. Ann. § 34:11-56a4 as to Plaintiffs' Overtime (NJWHL) Claims

RXO LM argues it is entitled to the statutory exemption as a "trucking industry employer" as to Plaintiffs' overtime (NJWHL) claims. (RXO MSJ. Br. at 30.) The NJWHL provides that every employer must pay its employees 1 ½ times the employee's regular hourly wage (the statutory rate) for each hour worked over 40 hours in a week. *See* N.J. Stat. Ann. § 34:11-56a4. "[T]rucking industry employers," however, are entitled to an exemption which permits them to pay "employees not less than 1 ½ times the minimum wage, rather than the statutory overtime rate of 1 ½ times the employee's regular hourly wage." *See In re Raymour and Flanigan Furniture*, 405 N.J. Super. 367, 370-72 (N.J. Super. Ct. App. Div. 2009). RXO LM contends it would fall within the definition of "trucking industry employer[,]"[20] and therefore, RXO LM argues Plaintiffs and the Class would not be entitled to the traditional overtime premium, provided that their wages were not less than 1 ½ times the minimum wage.

In opposition, Plaintiffs state that RXO LM incorrectly applies the law. (Pl. RXO Opp. at 15-19.) Plaintiffs assert the WHL explicitly provides: "every trucking industry employer shall pay to all drivers, helpers, loaders and mechanics … **an overtime rate** not less than 1 ½ times the minimum wage required pursuant to this section and N.J.A.C. 12:56-3.1." N.J. Stat. Ann. § 34:11-56a4 (emphasis added). Furthermore, the New Jersey Administrative Code explicitly titled "Overtime rates" provides that "[e]very trucking industry employer shall pay to all drivers, helpers, loaders and mechanics … an overtime rate not less than one and one-half times the minimum wage

---

[20] The NJWHL defines a "trucking industry employer" as "any business or establishment primarily operating for the purpose of conveying property from one place to another by road or highway, including the storage and warehousing of goods and property." N.J. Stat. Ann. § 34:11-56a4.

required pursuant to N.J. Stat. Ann. § 34:11-56a4 and N.J.A.C. 12:56-3.1." *See* N.J.A.C. 12:56-19.3.

Despite RXO LM's contentions, Courts in this district have rejected RXO LM's line of argument. In *Echavarria*, one defendant argued that certain plaintiffs did "not have valid overtime claims because if their flat daily rates were divided by the hours they worked, the resulting hourly wages would meet the statutory minimum wage and minimum overtime wage for truck drivers and helpers." *Echavarria*, 2016 WL 1047225, at *9. The court rejected this argument because the WHL "explicitly contemplates that drivers and helpers shall receive 'an overtime rate,' not simply a sufficiently high daily flat rate." *Id.* (quoting N.J. Stat. Ann. § 34:11-56a4); *see also* N.J.A.C. 12:56-5.1.

Here, employees of "trucking industry employer[s]" are entitled to an overtime premium rate of 1 ½ the minimum wage for each hour worked more than forty (40) hours in a week under the WHL. This requirement is independent of, and in addition to, whatever flat or piecemeal rate they may be paid. Based on the foregoing, the Court finds that as to Plaintiffs' overtime NJWHL claim, RXO LM's is not entitled to the trucking industry employer statutory exemption.

### e.  Unjust Enrichment

In response to Bob's argument that Plaintiffs' unjust enrichment claim fails as a matter of law, Plaintiffs stipulated to the "dismissal of the unjust enrichment claim." (ECF 200, Pl. Bob Opp. at 15.) Accordingly, Bob's motion for summary judgment as to the unjust enrichment claim is **GRANTED** and Plaintiffs' unjust enrichment claim is hereby **DISMISSED** as to Bob's.

RXO LM similarly moved for summary judgment on Plaintiffs' individual unjust enrichment claims. (*See* RXO MSJ. Br. at 35-36.) Plaintiffs failed to respond substantively. (*Cf.* ECF 201, Pl. RXO. Opp.) As a result of Plaintiffs' prior stipulation and Plaintiffs' failure to

substantively oppose RXO LM's motion, RXO LM's motion for summary judgment is **GRANTED** as to the unjust enrichment claim and Plaintiffs' unjust enrichment claim is hereby **DISMISSED** as to RXO LM.

## IV. <u>CONCLUSION</u>

For the reasons stated above, Plaintiffs' motion for summary judgment (ECF 191) is **DENIED**, Bob's motion for summary judgment (ECF 192) is **GRANTED,** and RXO LM's motion for summary judgment (ECF 196) is **DENIED**. An appropriate order follows.

*/s/ Jamel K. Semper*
**HON. JAMEL K. SEMPER**
**United States District Judge**

Orig:  Clerk
cc:    James B. Clark, U.S.M.J.
       Parties